**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

CHURCHILL MORTGAGE CORPORATION

Plaintiff,

v.

JEFFREY MILLER,

Defendant.

Civil Action No.

## VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER, INJUNCTIVE RELIEF, AND DAMAGES

Plaintiff Churchill Mortgage Corporation ("Churchill" or "Plaintiff"), by and through its undersigned counsel, hereby files this Verified Complaint, seeking a temporary restraining order, injunctive relief, and monetary damages against Defendant Jeffrey Miller ("Miller" or "Defendant"), and such other relief as the Court deems appropriate, and in support thereof, avers as follows:

## NATURE OF THE ACTION

1.      Miller, a former Vice President of the Northwest Region for Churchill, didn't simply take a new job after he was terminated. He took Churchill's confidential compensation and employee performance data and walked it over to a direct competitor—Everett Financial Inc. *dba* Supreme Lending ("Supreme")—and began inciting a revolution within Churchill. He didn't act alone. Miller and his new employer Supreme conspired to systematically poach Churchill's employees, including many top-producers, using proprietary information as a targeting tool and falsehoods about Churchill's financial health to fuel the fire. Their goal was clear: destabilize

Churchill from within, hijack its talent pipeline, and accelerate Supreme's growth on the back of their unlawful conduct. Miller knew what he was doing. He signed not one, but multiple contracts promising he would never do exactly this. He acknowledged in writing that Churchill's data belonged to the company and that he was prohibited from using it after leaving. He agreed in writing not to solicit Churchill employees after his employment ended. Then he did it anyway—quickly, aggressively, and unapologetically. When Churchill confronted Miller and Supreme with a cease-and-desist letter, their response was defiance. They didn't stop. They doubled down—escalating their solicitations, amplifying false claims about Churchill's solvency, and continuing to exploit the very data Miller swore to protect. This wasn't competition. It was calculation. Churchill brings this action not just to stop the bleeding, but to expose the scope of the wound. It seeks to hold Miller accountable for his breaches of contract, misappropriation of trade secrets, tortious interference with business relations, and defamation, and to enjoin the ongoing and irreparable harm caused by his and Supreme's concerted misconduct. The rules of the market are simple: earn your edge—don't steal it. Miller and Supreme chose the latter. This lawsuit is the consequence.

## THE PARTIES

2.      Plaintiff Churchill Mortgage Corporation ("Churchill") is a Tennessee corporation with a principal place of business at 1749 Mallory Lane, Suite 100, Brentwood, TN 37027. Churchill is a mortgage company that assists borrowers with obtaining mortgage loan products.

3.      Defendant Jeffrey Miller ("Miller") is an individual who currently resides at 16206 Twin Drive, La Pine, OR 97739, and is a former employee of Churchill.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because this action arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

5. The Court has subject matter jurisdiction over Churchill's state law claims under 28 U.S.C. § 1367(a) because the state law claims are so closely related to the federal claims and share a common nucleus of operative facts with the federal claims, such that the state and federal law claims are part of the same case or controversy.

6. Additionally, the Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because Churchill and Miller are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7. This Court has personal jurisdiction over Miller because he consented to personal jurisdiction in federal court in Tennessee.

8. Venue is proper in this District because Miller consented to litigate actions arising out of his employment with Churchill in federal court in Tennessee.

## FACTUAL ALLEGATIONS

9. Churchill brings this action against Miller, its former employee, in response to his brazen and unlawful scheme to steal Churchill's confidential compensation and employee performance data, trade secret information, and use that information to solicit Churchill's employees to join his new employer, Supreme, a competitor of Churchill.

10. In perpetrating the solicitation scheme, Miller flagrantly breached multiple contracts containing restrictive covenants prohibiting his solicitation of Churchill employees after he was terminated.

3

11.     Furthermore, Miller used Churchill's confidential compensation and employee performance data, to target and solicit Churchill's employees, including many of its top producing employees, to join his new employer, in violation of federal and state trade secret laws and his applicable contracts with Churchill.

12.     To enhance the success of his scheme, Miller made repeated disparaging, defamatory and demonstrably false statements about Churchill's financial health to its employees in order to induce them to accept his solicitations to join Supreme. This conduct was also in violation of the applicable contracts Miller had with Churchill.

13.     Miller did not act alone. Rather, he conspired with his new employer Supreme to systematically poach Churchill's best employees. The goal of their conspiracy was to destabilize Churchill, take its best employees, and accelerate Supreme's growth through this unlawful conduct perpetrated against a competitor.

14.     Churchill brings this action to hold Miller accountable for his willful and egregious misconduct, and to enjoin his ongoing actions to conspire against Churchill by poaching its employees, misappropriating its trade secrets, disparaging and defaming the company, and interfering with its business relationships.

15.     If Miller is permitted to continue to solicit Churchill's employees and misappropriate its confidential information, Churchill will be irreparably harmed.

I.      **Miller's Contractual Agreements with Churchill**

A.  **Miller's Employment Agreements**

16.     Miller was initially hired by Churchill in or around February 2019.

17.     Miller's position at Churchill was Vice President of the Northwest Region.

4

18. In this role, Miller managed other Churchill employees. At the time of his termination, he managed approximately sixty-five (65) Churchill employees across roughly twenty-two (22) branch offices.

19. As part of his role, Miller was entrusted with oversight responsibilities, had access to, and used Churchill's sensitive confidential information and trade secrets to perform his job responsibilities. This confidential information and trade secrets included Churchill's customer lists, employee compensation data, and employee performance data (*e.g.*, the level of production of employees).

20. Churchill spent years arriving at the proper compensation formula for its employees and developing the proper systems to track employee metrics, which is why it only provided access to certain managerial individuals at the company.

21. Churchill takes active measures to protect the secrecy of its confidential information and trade secrets, including but not limited to: restricting user access to this information, maintaining it on secure systems, monitoring user access, and requiring employees to sign agreements that contain confidentiality provisions regarding this information. Only certain individuals, like Miller when he was employed by Churchill, are given access to Churchill's customer lists, employee compensation data, and employee performance data.

22. Churchill takes such measures to maintain the secrecy of its confidential information and trade secrets because it would suffer extreme and unfair competitive harm if such confidential information and trade secrets were to be obtained by, or used on behalf of, a competitor.

23. Given his access to this sensitive information, Churchill required Miller to sign an employment agreement.

5

24.     Miller entered into his first employment agreement with Churchill on or around February 19, 2019. He initialed every page of and executed the agreement.

25.     This February 19, 2019, employment agreement contained, among other things, provisions prohibiting Miller from soliciting Churchill's employees, customers, and using its confidential and trade secret information, should his employment with Churchill be terminated.

26.     From 2020 to 2023, Miller signed five (5) substantially similar employment agreements, containing non-solicitation provisions and clauses prohibiting him from using its confidential and trade secret information following termination.

27.     On or around September 13, 2024, Miller executed his final employment agreement, entitled "Churchill Mortgage Nonproducing Branch Manager Employment Agreement" ("Employment Agreement"). Miller signed it and initialed every page of the agreement, and it became effective on September 1, 2024. A copy of the Employment Agreement is attached as Exhibit A.

28.     The Employment Agreement was voluntarily entered into by Miller and is a valid and enforceable contract.

29.     By signing the Employment Agreement, Miller agreed to express provisions regarding the use of Churchill's confidential information and prohibiting the solicitation of Churchill employees after the termination of his employment. These provisions are set forth in the "V. Confidentiality and Non-Solicitation" section of the Employment Agreement.

30.     For instance, the Employment Agreement makes clear that Miller occupied "a position of trust and confidence with [Churchill] and that [Miller] will have access to confidential and proprietary information and trade secrets of [Churchill], all of which are the unique and valuable property of [Churchill]." Miller acknowledged that he had access to certain confidential

information, including "employer's documentation," and states that he was required—both during his employment and after termination—to "use such information solely for [Churchill's] benefit, and maintain as secret[.]" Miller expressly warranted that he "will not disclose any of the Confidential Information to any third party (except as Employee's duties may require) without [Churchill's] prior express written authorization." Ex. A at ¶ V(A).

31.     Miller also acknowledged that "all documents, files, electronic records or data, or records or materials of any sort pertaining to [Churchill's] business […] are the sole and exclusive property of [Churchill]" and agreed that he "has no right to keep or use such documents or things following termination of his/her employment." He agreed to immediately return any such documents in his possession upon the termination of his employment. Ex. A at ¶ V(B).

32.     Miller also agreed to comply with non-solicitation provisions. Specifically, Miller agreed that, for a period of 12 months after the termination of his employment, he "will not on behalf of himself or on behalf of any other person, firm, or entity, directly or indirectly solicit" anyone employed by Churchill to leave Churchill or form or join another entity. Ex. A at ¶ V(F). The Employment Agreement further states that this 12-month period does not "include any period(s) of violation or period(s) of time required for litigation to enforce the covenants herein."

33.     Given these restrictive covenants, Miller agreed to "show this Agreement to any subsequent employer with whom s/he works within 12 months following the termination of employment with Company." Ex. A at ¶ V(G).

34.     Miller's Employment Agreement also specified the compensation and benefits he received from Churchill, including his base salary and certain performance incentives.

35.     On May 21, 2025, Churchill terminated Miller's employment with the company due to performance and company re-organization.

7

36.     On May 27, 2025, in line with its typical practice, Churchill sent a "Notice of Confidentiality, Non-Solicitation" letter to Miller.

37.     The letter reminded Miller of the non-solicitation provisions in his Employment Agreement, the restrictions regarding use of Churchill's confidential information, and his obligation to provide his new employer with a copy of his Employment Agreement. A copy of this letter is attached as Exhibit B.

### B. Miller's Severance Agreement

38.     On May 29, 2025, in exchange for severance payments, Miller entered into another agreement with Churchill containing confidentiality and non-solicitation provisions, as well as non-disparagement clause ("Severance Agreement"). Miller initialed each page of and executed the Severance Agreement. A redacted copy of the Severance Agreement is attached as Exhibit C.

39.     The Severance Agreement was voluntarily entered into by Miller and is a valid and enforceable contract.

40.     In the Severance Agreement, Miller agreed, represented, warranted, and covenanted that "he will not use, disclose, directly or indirectly, any Confidential Information to any person, firm, company, or entity for any reason without the express written permission by [Churchill]."

41.     The Severance Agreement defines "Confidential Information" as including certain physical property and "records, policy manuals, business contracts, and other confidential information relating to [Churchill's] internal financial information, business methods, plans and efforts, [and] personnel data[.]"

42.     By executing the Severance Agreement, Miller also agreed to not solicit "employees to leave [Churchill]; form or join another entity; and/or sever (or cause the termination) of their relationship with [Churchill]" for 12 months following his termination.

43.     Under the Severance Agreement, Miller also agreed that he will not "at any time hereafter disparage [Churchill] (including its owners, stockholders, partners, members, predecessors, successors, assigns, agents, directors, officers, employees, representatives, attorneys, divisions, subsidiaries, and affiliates ), whether orally, in writing, on any social media platform, by action or inaction, or by any other means."

44.     On or around June 4, 2024, Miller was hired by Supreme. He is a Regional Manager for Supreme.

## II.     Miller's Unlawful Solicitation of Churchill Employees

45.     Despite his clear knowledge and acceptance of the covenants in his Employment Agreement and Severance Agreement, Miller chose to willfully and consciously disregard each and every one of them.

46.     Miller, upset about his termination from Churchill, was looking for a way to inflict maximum harm against his former employer.

47.     Miller found a willing partner in his new employer Supreme. Miller and Supreme conspired to systematically poach Churchill's top-performing employees to join Supreme.

48.     As described below, Miller and Supreme utilized Churchill's confidential and trade secret information as a tool to target solicitations to Churchill's employees and made false and defamatory statements about Churchill's financial health and viability to lure its employees into accepting their offers.

9

### A. Miller's Successful Poaching of Churchill's Employees

49.     In just over a month since Miller's termination, six (6) Churchill employees—Jenny Detweiler, Joe Ackerland, Azemira Tucakovic, Kelly Trudy, Lora Hawkinson, and Emily Autore—have resigned from Churchill and joined Supreme as a direct result of Miller's unlawful solicitations.

**Jenny Detweiler**

50.     Between May and July 2025, Miller contacted Jenny Detweiler ("Detweiler").

51.     Detweiler was an employee of Churchill at this time.

52.     Miller's goal was to encourage Detweiler to leave Churchill and join Supreme.

53.     Miller used Churchill's confidential employee compensation and performance data to target his solicitation to Detweiler.

54.     As part of his pitch to Detweiler, Miller made promises about the compensation that Supreme could offer to her.

55.     To induce her to leave Churchill, Miller made at least one false statement to Detweiler about Churchill's financial condition.

56.     Shortly after these solicitations, Detweiler resigned from Churchill.

57.     In or around July 2025, Detweiler accepted Miller's offer to join Supreme.

**Joe Ackerland**

58.     Between May and July 2025, Miller contacted Joe Ackerland ("Ackerland").

59.     Ackerland was an employee of Churchill at this time.

60.     Miller's goal was to encourage Ackerland to leave Churchill and join Supreme.

61.     Miller used Churchill's confidential employee compensation and performance data to target his solicitation to Ackerland.

10

62.     As part of his pitch to Ackerland, Miller made promises about the compensation that Supreme could offer to her.

63.     To induce him to leave Churchill, Miller made at least one false statement to Ackerland about Churchill's financial condition.

64.     Shortly after these solicitations, Ackerland resigned from Churchill.

65.     In or around July 2025, Ackerland accepted Miller's offer to join Supreme.

**Azemira Tucakovic**

66.     Between May and July 2025, Miller contacted Azemira Tucakovic ("Tucakovic").

67.     Tucakovic was an employee of Churchill at this time.

68.     Miller's goal was to encourage Tucakovic to leave Churchill and join Supreme.

69.     Miller used Churchill's confidential employee compensation and performance data to target his solicitation to Tucakovic.

70.     As part of his pitch to Tucakovic, Miller made promises about compensation that Supreme could offer to her.

71.     To induce her to leave Churchill, Miller made at least one false statement to Tucakovic about Churchill's financial condition.

72.     Shortly after these solicitations, Tucakovic resigned from Churchill.

73.     Tucakovic confirmed to Churchill that she would be joining Supreme.

**Kelly Trudy**

74.     Between May and July 2025, Miller contacted Kelly Trudy ("Trudy").

75.     Trudy was an employee of Churchill at this time.

76.     Miller's goal was to encourage Trudy to leave Churchill and join Supreme.

77.     Miller used Churchill's confidential employee compensation and performance data to target his solicitation to Trudy.

78.     As part of his pitch to Trudy, Miller made promises about compensation that Supreme could offer to her.

79.     To induce her to leave Churchill, Miller made at least one false statement to Trudy about Churchill's financial condition.

80.     Shortly after these solicitations, Trudy resigned from Churchill.

81.     In or around July 2025, Trudy accepted Miller's offer to join Supreme.

**Lora Hawkinson**

82.     Between May and July 2025, contacted Lora Hawkinson ("Hawkinson").

83.     Hawkinson was an employee of Churchill at this time.

84.     Miller's goal was to encourage Hawkinson to leave Churchill and join Supreme.

85.     Miller used Churchill's confidential employee compensation and performance data to target his solicitation to Hawkinson.

86.     As part of his pitch to Hawkinson, Miller made promises about compensation that Supreme could offer.

87.     To induce her to leave Churchill, Miller made at least one false statement to Hawkinson about Churchill's financial condition.

88.     Shortly after these solicitations, Hawkinson resigned from Churchill.

89.     In or around July 2025, Hawkinson accepted Miller's offer to join Supreme.

**Emily Autore**

90.     Between May and July 2025, Miller contacted Emily Autore ("Autore").

91.     Autore was an employee of Churchill at this time.

12

92. Miller's goal was to encourage Autore to leave Churchill and join Supreme.

93. Miller used Churchill's confidential employee compensation and performance data to target his solicitation to Autore.

94. As part of his pitch to Autore, Miller made promises about compensation that Supreme could offer to her.

95. To induce her to leave Churchill, Miller made at least one false statement to Autore about Churchill's financial condition.

96. Shortly after these solicitations, Autore resigned from Churchill Mortgage.

97. In or around July 2025, Autore accepted Miller's offer to join Supreme.

**B. Miller's Ongoing Solicitations of Churchill's Employees**

98. In addition to the six (6) employees that have already left Churchill as a direct result of Miller's solicitations, he has attempted to solicit other Churchill employees to join Supreme, and his actions are ongoing.

99. Miller made these solicitations through text messages to current Churchill employees. In addition, he arranged meetings for lunch or drinks with other Churchill employees to solicit them to join Supreme.

100. For example, Miller began persistently texting Churchill Employee Emily Green in June 2025 to encourage her to terminate her employment with Churchill and work for Supreme.

101. In these text messages, Miller asked Green to catch up so he could share information with her about Supreme so she could see "what the future looks like" for her.

102. Hearing no response for a few days, Miller repeatedly texted her and asked her to catch up so that he could share the information about Supreme and her "future."

13

103.     Miller's efforts did not stop there. He arranged a lunch with Churchill's Dallas Branch Manager, Mason Whitehead, shortly after his termination.

104.     During this lunch, Miller emphatically discussed Supreme and touted the benefits of working at Supreme.

105.     Miller's motivations crystalized just a few days later when Whitehead received a phone call from an individual at Supreme seeking to recruit him to join. The Supreme recruiter who contacted Whitehead referenced their "mutual friend" Jeff Miller.

106.     In other words, Miller enlisted the help of other Supreme employees to solicit Whitehead.

107.     Just two days after his termination from Churchill, Miller was at it again. This time, he invited two other Churchill employees, Tricia Parker and Katy Canales, to meet him for drinks. In an effort to convince them to leave Churchill for Supreme, he made false statements about Churchill's financial health and viability.

108.     Miller's solicitations are active, ongoing, and undeterred, despite Churchill's warning him that his conduct is illegal and in violation of his agreements.

109.     Churchill has an existing business relationship with each of its current employees, and had a business relationship with those that Miller solicited to join Supreme. By and through this conduct, Miller interfered with these business relationships.

110.     All of these employees either worked with or under Miller while he was at Churchill.

### III. Miller Conspired with Supreme to Use Churchill's Trade Secrets to Target the Illegal Poaching Scheme

111.    Through his widespread solicitations to its employees, Churchill discovered that Miller is utilizing its confidential compensation and employee performance data, a trade secret, to target his solicitations to these employees.

112.    Beyond that, Miller also shared Churchill's confidential data and trade secrets with Supreme so that they could craft competitive offers to these employees to induce them to leave Churchill.

113.    Miller and Supreme shared a common goal: to destabilize Churchill from within, raid its top-producing employees, and accelerate Supreme's growth on the back of this illegal conduct.

114.    Miller's communications with Churchill employees have gone well beyond just those employees that he managed.

115.    Instead, he's working in concert with Supreme to carry out a widespread poaching campaign that targets Churchill's support employees, branch managers, processors, and executive assistants across the company.

116.    For example, Miller directly solicited two processors, Courtney Benson and Tricia Parker, who worked for a different Churchill Branch Manager.

117.    Miller used Churchill's confidential and trade secret employee compensation data to target his solicitation to Benson and Parker.

118.    Specifically, he used his inside knowledge of Churchill's compensation data to make them offers of "$35 per hour" to them, assuring them that they are the "lowest paid processors" at Churchill.

15

119. Worse still, he then used his knowledge of another Churchill employee's compensation to play them against each other, telling Ms. Benson and Ms. Parker that another processor earned $150,000 last year.

120. Undeterred by the clear prohibitions against this in his Employment Agreement and Severance Agreement, and Churchill's reminder of these restrictive covenants in its Notice of Confidentiality, Non-Solicitation letter, Miller intentionally and maliciously proceeded with the scheme.

## IV. Miller Conspired with Supreme to Execute a Defamatory Campaign Against Churchill to Fuel the Poaching

121. Miller and Supreme also conspired to execute a defamatory campaign against Churchill to increase the success of their unlawful solicitations.

122. To ensure the success of his poaching campaign, Miller needed to shake the confidence in Churchill's financial condition, cause fear amongst employees, and ultimately increase his conversion rate of employee movement to Supreme.

123. To do so, Miller repeatedly made the following disparaging and defamatory statements to numerous Churchill employees, including, but not limited to, those employees identified above:

a. That Churchill is out of money;

b. The Churchill employee stock ownership plan ("ESOP") is out of money;

c. The Churchill ESOP is "underwater" due to a lawsuit against the ESOP and the company;

d. Churchill is for sale; and

e. Churchill is in financial trouble.

16

124.    At least two Churchill employees—both high-producers—informed Churchill that Miller made these defamatory statements.

125.    These two employees advised Churchill that they were seriously considering accepting Miller's solicitation to join Supreme because they feared that Churchill was not an economically stable company. They attributed this fear to Miller's statements.

126.    Miller made these statements with reckless disregard for the truth or with negligence in failing to ascertain the truth of the statement as a basic investigation would reveal the falsity of these statements.

**V.    Miller and Supreme Disregard Churchill's Cease and Desist Letter**

127.    Upon learning of this unlawful conduct, Churchill immediately sent Miller a cease-and-desist letter and preservation notice ("Cease-and-Desist") on June 26, 2025, warning that his misconduct constituted violations of his Employment Agreement, the Severance Agreement, and must stop.

128.    That same day, Churchill also sent a copy of the Cease-and-Desist to Supreme.

129.    One day later, counsel for Supreme contacted counsel for Churchill. Supreme's counsel acknowledged receipt of the Cease-and-Desist and indicated he would get back in touch. He never did.

130.    Yet despite receiving the Cease-and-Desist, Miller, acting in concert with his co-conspirator Supreme, continues to disregard the law and his contractual agreements, by soliciting employees at Churchill, using Churchill's proprietary data, and making defamatory statements about Churchill's financial condition in an ongoing effort to lure employees away from Churchill to Supreme.

131.     Churchill has and continues to be harmed as a direct and proximate result of the illegal conduct described above, including by losing high-value employees, losing business income and profits, incurring expenses, suffering reputational damage, and by loss of goodwill.

132.     A temporary restraining order and injunctive relief is necessary to protect against this irreparable harm.

## COUNT I
## Breach of Contract – Employment Agreement

133.     Churchill repeats and realleges the prior allegations as if fully set forth herein.

134.     Miller's Employment Agreement was a valid, binding, and enforceable contract voluntarily entered into with Churchill.

135.     Miller breached the Employment Agreement's confidential information provisions by using and disclosing employee compensation data for his and Supreme's benefit to solicit employees away from Churchill.

136.     Miller's use of Churchill's confidential employee compensation data is ongoing.

137.     Miller breached the Employment Agreement's non-solicitation provision by soliciting multiple employees shortly after his employment terminated, and prior to the expiration of twelve months.

138.     To date, Miller's solicitation was successful of at least six Churchill employees, demonstrating clear loss to Churchill of personnel and revenue, constituting concrete harm to Churchill.

139.     Miller's efforts to solicit Churchill's employees in violation of his employment contract are ongoing.

140.     Miller breached the Employment Agreement by failing to provide his Employment Agreement to his subsequent employer, Supreme.

18

141.     Miller's breaches of contract described herein have already and continue to harm Churchill. In addition, as a direct and proximate result of his actions, Churchill has been damaged in an amount to be proven at trial, including through its loss of high-value employees, loss of business income and profits, incurred expenses, and loss of goodwill due to Miller's misconduct.

142.     Such damages are, however, insufficient to provide a full and complete remedy to Churchill. Unless restrained, enjoined, and ordered to specifically abide by the post-termination obligations in the Employment Agreement, Miller will persist in his breaches of contract, thereby causing immediate, irreparable damage to Churchill.

## COUNT II
### Breach of Contract – Severance Agreement

143.     Churchill repeats and realleges the prior allegations as if fully set forth herein.

144.     Miller's Severance Agreement was a valid, binding, and enforceable contract voluntarily entered into with Churchill.

145.     Miller breached the Severance Agreement's confidential information provisions by using and disclosing employee compensation data for his and Supreme's benefit to solicit employees away from Churchill.

146.     Miller's use of Churchill's confidential employee compensation data is ongoing.

147.     Miller breached the Severance Agreement's non-solicitation provision by soliciting multiple employees shortly after his employment terminated, and prior to the expiration of twelve months.

148.     To date, Miller's solicitation was successful of at least six Churchill employees, demonstrating clear loss to Churchill of personnel and revenue, constituting concrete harm to Churchill.

19

149.    Miller's efforts to solicit Churchill's employees in violation of his Severance Agreement are ongoing.

150.    Miller breached the Severance Agreement's non disparagement provision by making multiple disparaging remarks about Churchill's financial condition to several employees.

151.    Miller's breaches of contract described herein have already and continue to harm Churchill. In addition, as a direct and proximate result of his actions, Churchill has been damaged in an amount to be proven at trial, including through its loss of high-value employees, loss of business income and profits, incurred expenses, reputational damage, and loss of goodwill due to Miller's misconduct.

152.    Such damages are, however, insufficient to provide a full and complete remedy to Churchill. Unless restrained, enjoined, and ordered to specifically abide by the post-termination obligations in the Severance Agreement, Miller will persist in his breaches of contract, thereby causing immediate, irreparable damage to Churchill.

## COUNT III
### Misappropriation of Trade Secrets Under the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA")

153.    Churchill repeats and realleges the prior allegations as if fully set forth herein.

154.    The Defend Trade Secrets Act (18 U.S.C. § 1836) prohibits the misappropriation of trade secrets.

155.    Churchill derives independent economic value from its proprietary employee compensation data, which is not generally known or public, which Churchill took reasonable measures to maintain and protect the secrecy of, including by requiring employees entrusted with such information to sign employment agreements containing confidentiality provisions, restricting

access to this information, maintaining it on secure systems, and monitoring its use, and which would provide economic value to others if disclosed.

156.     Churchill spent years arriving at the proper compensation formula for its employees and developing the proper systems to track employee metrics, which is why it only provided access to certain managerial individuals at the company.

157.     The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(3), defines a trade secret as, *inter alia*, "all forms and types of financial, business, scientific, technical, economic, or engineering information … whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically graphically, photographically, or in writing" – provided that the owner took "reasonable measures to keep such information secret," and it offers the holder of the trade secret and advantage over competitors who do not know or use the trade secret."

158.     Churchill's employee compensation data qualifies as a trade secret under the DTSA.

159.     The employee compensation data at issue in this case is related to products and/or services used in interstate commerce.

160.     Churchill entrusted Miller with employee compensation data in the performance of his job.

161.     Miller improperly, unlawfully, willfully, and maliciously utilized the employee compensation data for his own, and Supreme's, benefit and to the harm of Churchill. In doing so, he also violated his employment agreement.

162.     Miller utilized such trade secrets without Churchill's express or implied consent, all to Churchill's detriment.

163.     Miller directly caused Churchill harm through the loss of current and future business, income, and profits, loss of employees, and loss of goodwill.

164.     Miller's conduct has and will continue to cause Churchill harm. In addition, as a direct and proximate result of his actions, Churchill has been damaged in an amount to be proven at trial.

165.     Churchill has no adequate remedy at law against Miller's misconduct, in that the damages for such misconduct are difficult to ascertain completely and with precision. Unless Miller is restrained and enjoined from further misappropriation, Churchill will suffer irreparable harm in addition to economic harm.

166.     Miller's misappropriation of the employee compensation data was willful and malicious and therefore is liable to Churchill for exemplary damages "in an amount not more than 2 times the amount of the damages awarded," 18 U.S.C. § 1836(b)(3)(C).

### COUNT IV
### Misappropriation of Trade Secrets Under the Tennessee Uniform Trade Secrets Act ("TUTSA")

167.     Churchill repeats and realleges the prior allegations as if fully set forth herein.

168.     The Tennessee Uniform Trade Secrets Act (Tenn. Code Ann. §§ 47-25-1701, *et seq.*) prohibits the misappropriation of trade secrets.

169.     Churchill derives independent economic value from its proprietary employee compensation data, which is not generally known or public, which Churchill took reasonable measures to maintain and protect the secrecy of, including by requiring employees entrusted with such information to sign employment agreements containing confidentiality provisions, restricting access to this information, maintaining it on secure systems, and monitoring its use, and which would provide economic value to others if disclosed.

22

170. Churchill spent years arriving at the proper compensation formula for its employees and developing the proper systems to track employee metrics, which is why it only provided access to certain managerial individuals at the company.

171. The TUTSA, defines a trade secret as, *inter alia*, "information, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan" that "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use" and is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

172. Churchill's employee compensation data qualifies as a trade secret under the TUTSA.

173. Churchill entrusted Miller with employee compensation data in the performance of his job.

174. Miller improperly, unlawfully, willfully, and maliciously utilized the employee compensation data for his own, and Supreme's, benefit and to the harm of Churchill. In doing so, he also violated his employment agreement.

175. Miller utilized such trade secrets without Churchill's express or implied consent, all to Churchill's detriment.

176. Miller directly caused Churchill harm through the loss of current and future business, income, and profits, loss of employees, and loss of goodwill.

177.     Miller's conduct has and will continue to cause Churchill harm. In addition, as a direct and proximate result of his actions, Churchill has been damaged in an amount to be proven at trial.

178.     Churchill has no adequate remedy at law against Miller's misconduct, in that the damages for such misconduct are difficult to ascertain completely and with precision. Unless Miller is restrained and enjoined from further misappropriation, Churchill will suffer irreparable harm in addition to economic harm.

179.     Miller's misappropriation of the employee compensation data was willful and malicious and therefore is liable to Churchill for exemplary damages "in an amount not exceeding twice" the amount of the damages awarded. Tenn. Code Ann. § 47-25-1704(b).

## COUNT V
## Defamation

180.     Churchill repeats and realleges the prior allegations as if fully set forth herein.

181.     Miller made multiple defamatory statements to employees of Churchill that are demonstrably false in order to effectuate his solicitation scheme.

182.     Among other things, Miller made the following false statements to Churchill employees:

   a.   That Churchill is out of money;

   b.   The Churchill ESOP is out of money;

   c.   The Churchill ESOP is "underwater" due to a lawsuit against the ESOP and the company;

   d.   Churchill is for sale; and

   e.   Churchill is in financial trouble.

24

183. Each of these statements is categorically false and intended to cast Churchill's financial condition as tenuous in order to induce employees to accept the illegal solicitations to join Supreme.

184. Miller made these statements with reckless disregard for the truth or with negligence in failing to ascertain the truth of the statement as a basic investigation would reveal the falsity of these statements.

185. Miller's defamatory statements have and will continue to cause Churchill harm. In addition, as a direct and proximate result of his actions, Churchill has been damaged in an amount to be proven at trial, including through loss of high-value employees, loss of business income and profits, incurred expenses, reputational damage, and loss of goodwill.

## COUNT VI
### Tortious Interference with Business Relations

186. Churchill repeats and realleges the prior allegations as if fully set forth herein.

187. Churchill had an existing business relationship with each of its employees, including those that worked for and under Miller.

188. Miller had knowledge of these relationships, because he was aware that Churchill licensed, paid, and provided support to each employee, many of whom he supervised while employed by Churchill.

189. Miller intentionally sought to destroy the business relationship that Churchill has with its employees, by soliciting employees to leave Churchill and join his new employer, including by making defamatory statements about Churchill's financial position in an effort to lure them to accept his solicitation to join Supreme.

190.     Miller used improper means to perpetrate his illegal solicitations, including by misappropriating Churchill's trade secrets and making false defamatory statements, in violation of federal and state law and his Employment Agreement with Churchill.

191.     As a result of Miller's tortious interference, Churchill has been and continues to be irreparably harmed by his actions. In addition, as a direct and proximate result of this conduct, Churchill has been damaged in an amount to be proven at trial, including through loss of high-value employees, loss of business income and profits, incurred expenses, reputational damage, and loss of goodwill.

192.     Churchill has no adequate remedy at law against Miller's misconduct, in that the damages for such misconduct are difficult to ascertain completely and with precision. Unless Miller is restrained and enjoined from further interference, Churchill will suffer irreparable harm in addition to economic harm.

## COUNT VII
## Civil Conspiracy

193.     Churchill repeats and realleges the prior allegations as if fully set forth herein.

194.     Beginning in or around May 2025, Miller and Supreme conspired to take the tortious actions described herein together against Churchill.

195.     Miller and Supreme shared a common goal: to inflict financial harm against Churchill by illegally soliciting as many Churchill employees as possible using whatever means necessary, thereby interfering with its business relationships.

196.     Rather than competing fairly for Churchill's coveted employees, Miller and Supreme conspired to defame Churchill as a failing business and interfere with its business relationships, leveraging Churchill's stolen trade secrets to ensure that their illegal solicitation efforts would have a higher chance of success.

26

197.     Miller and Supreme, acting in concert, agreed to take several affirmative steps to further this conspiracy:

        a.      Miller solicited employees at Churchill to resign from Churchill and join Supreme;

        b.      Miller made false and defamatory statements to employees in an effort to reputationally harm Churchill publicly and in the eyes of its employees; and

        c.      Miller stole confidential and trade secret compensation data from Churchill that he used to target his solicitations; and

        d.      Miller shared that confidential and trade secret data with Supreme so that Supreme could make competitive employment offers to Churchill's employees.

198.     Miller and Supreme committed multiple independent torts, identified herein, including interference with business relationships and defamation, and in doing so acted intentionally and maliciously.

199.     Miller and Supreme took these tortious actions in direct violation of applicable laws, for the primary purpose of inflicting financial harm against Churchill and interfering with its business relationships.

200.     As a result of Miller and Supreme's civil conspiracy, Churchill has been and continues to be irreparably harmed by their actions. In addition, as a direct and proximate result of this conduct, Churchill has been damaged in an amount to be proven at trial, including through loss of high-value employees, loss of business income and profits, incurred expenses, reputational damage, and loss of goodwill.

## COUNT VIII
## Application for Temporary Restraining Order and Permanent Injunctive Relief

201.     Churchill repeats and realleges the prior allegations as if fully set forth herein.

202.    Churchill will suffer irreparable harm for which no adequate remedy at law exists if Miller is not enjoined from continuing his current course of action. Miller intends on continuing to ignore his Employment Agreement and Severance Agreement by soliciting Churchill's employees to join Supreme and using Churchill's confidential information and trade secrets to do so, in violation of his contractual obligations to Churchill and other applicable laws.

203.    If Miller is allowed to continue to pursue his current course of action, Churchill will suffer irreparable harm and stands to lose: (1) its employees; (2) the value of the confidential information and trade secrets that it has expended extensive time and money to develop; (3) goodwill and business from its clients and prospective clients; and (4) valuable business opportunities that it has expended extensive time and money to develop. These employees, trade secrets, clients, and business opportunities are essential to Churchill's competitive advantage.

204.    In addition to the loss of value to Churchill's confidential and proprietary information and trade secrets due to Miller's improper actions, Churchill will be damaged through loss of revenue, loss of clients, impairment of future earning capacity, diminution in the value of its business, and/or loss of goodwill.

205.    A temporary injunction is necessary to preserve Churchill's rights pending a trial on the merits of this action, and a permanent injunction is warranted by the facts of this case.

206.    There is a substantial likelihood that Churchill will prevail on the merits because Miller is violating clear provisions in his contracts with Churchill and using its confidential trade secrets to carry out this scheme. Miller's poaching of Churchill's employers and misappropriation of its trade secrets have caused or threaten to cause irreparable harm to Churchill. Churchill is entitled to an injunction enjoining Miller from these actions. The threatened disclosure of confidential information and trade secrets, loss of employees, and the resulting threat of injury to

28

Churchill's business outweighs any possible damage to Miller. Miller would lose nothing by such an injunction except that which he obtained unlawfully. Finally, the public interest is served by an injunction as it protects contractual rights, trade secrets, fair competition, and the substantial investment made by Churchill in developing its successful business.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Churchill respectfully requests that the Court enter judgment in its favor and against Miller:

    a.    Granting a temporary restraining order and injunctive relief:

        i.    Enjoining Miller from, directly or indirectly, soliciting Churchill's employees;

        ii.    Enjoining Miller from utilizing proprietary or confidential information, including trade secrets, he obtained from Churchill;

        iii.    Ordering Miller to provide for inspection, data collection, and analysis to a third-party forensic expert selected by Churchill, any desktop, laptop, smartphone, tablet computer, or external hard drive used by him, including by not limited to iPhones, Androids, Blackberries, CD-ROMs, USB drives, and thumb drives;

        iv.    Enjoining Miller from, directly or indirectly, using, disclosing, or deleting any proprietary, confidential or trade secret information of Churchill; and

        v.    Ordering Miller to provide for inspection, data collection, and analysis to a third-party forensic expert selected by Churchill, all storage accounts and all email accounts and emails therein used by him since May 1, 2025, as

well as all information needed to access the cloud storage accounts and email accounts, including user identification and password.

b.      awarding Churchill such actual and nominal damages as may be proven, in excess of $75,000, as a result of Miller's conduct;

c.      awarding Churchill exemplary damages arising out of the DTSA and TUTSA claims;

d.      awarding Churchill punitive damages arising out of the civil conspiracy, defamation, and tortious interference with business relations claims;

e.      awarding Churchill pre-judgment and post-judgment interest;

f.      awarding Churchill its costs in this litigation;

g.      awarding Churchill its attorneys' fees; and

h.      granting Churchill such other relief as the Court deems just, equitable, and proper.

### **Demand for Jury Trial**

Churchill respectfully requests and demands a jury trial on all issues so triable.

Dated this 9th day of July, 2025.

Respectfully submitted,

/s/ Stephen H. Price
Stephen H. Price, TN Bar No. 014658
**JACKSON LEWIS, P.C.**
611 Commerce Street, Suite 2803
Nashville, TN 37203
Office: (615) 565-1661
stephen.price@jacksonlewis.com

Lucas Markowitz (*pro hac forthcoming*)
Sean Hennessy (*pro hac forthcoming*)
Arielle Stephenson (*pro hac forthcoming*)
**MITCHELL SANDLER PLLC**
2020 K Street NW, Suite 760
Washington, DC 20006
Office: (202) 886-5260
lmarkowitz@mitchellsandler.com
shennessy@mitchellsandler.com
astephenson@mitchellsandler.com

*ATTORNEYS FOR PLAINTIFF*
*CHURCHILL MORTGAGE*
*CORPORATION*

31

## **VERIFICATION**

I, Matt Clarke, state that I serve as the President and Chief Operating Officer for Churchill Mortgage Corporation, the Plaintiff in this matter. I have read and understand this Verified Complaint and have personal knowledge of the allegations therein. I believe that the allegations are true and correct to the best of my knowledge, information, and belief. I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Matt Clarke (Jul 8, 2025 19:27 CDT)

# Churchill v Miller - Verification Page

**Final Audit Report** 2025-07-09

| | |
|---|---|
| Created: | 2025-07-08 |
| By: | Sean Hennessy (shennessy@mitchellsandler.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAYn58pKSZp9PrQLPht0BC13uobrn64T5v |

## "Churchill v Miller - Verification Page" History

Document created by Sean Hennessy (shennessy@mitchellsandler.com)
2025-07-08 - 11:08:38 PM GMT

Document emailed to Matt Clarke (mattc@churchillmortgage.com) for signature
2025-07-08 - 11:10:24 PM GMT

Email viewed by Matt Clarke (mattc@churchillmortgage.com)
2025-07-09 - 0:26:29 AM GMT

Document e-signed by Matt Clarke (mattc@churchillmortgage.com)
Signature Date: 2025-07-09 - 0:27:00 AM GMT - Time Source: server

Agreement completed.
2025-07-09 - 0:27:00 AM GMT

**Adobe Acrobat Sign**