IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| CHURCHILL MORTGAGE CORPORATION<br><br>               Plaintiff,<br><br>  v.<br><br>JEFFREY MILLER,<br><br>               Defendant. | Civil Action No. 3:25-cv-00765<br><br>Judge Aleta A. Trauger |

**PLAINTIFF'S OPPOSED MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT, TO ADD JULIE LAPHAM AS A DEFENDANT, AND FOR RELIEF FROM THE SCHEDULING ORDER AND MEMORANDUM OF LAW IN SUPPORT**

Plaintiff Churchill Mortgage Corporation ("Plaintiff" or "Churchill") moves for leave to file its Second Amended Complaint, to add Julie Lapham as a defendant, and for relief from the Scheduling Order pursuant to Federal Rules of Civil Procedure ("Rule") 15(a)(2), 16(b)(4), and 20(a)(2), and Local Rule 15.01.[1] Because this Motion is filed after the November 29, 2025 deadline for amended pleadings set forth in the Court's Initial Case Management Order (Dkt. No. 33), Plaintiff seeks relief under Rule 16(b)(4) and demonstrates good cause below. The request is not born of strategy. It is born of necessity—driven by facts Churchill could not have discovered earlier despite the exercise of diligence. Those facts reveal a coordinated scheme: Julie Lapham, a former Churchill branch manager, conspired with Defendant Jeffrey Miller ("Defendant" or "Miller") to

---

[1] Pursuant to Local Rule 7.01(a), undersigned counsel conferred with counsel for Defendant prior to filing this motion. Defendant opposes this motion.

1

solicit Churchill's employees and customers and to misuse Churchill's confidential and trade secret information, including borrower nonpublic personal information.[2]

## PROCEDURAL BACKGROUND

Churchill filed this action on July 9, 2025, asserting claims arising from Miller's conspiracy to use misappropriated confidential information and trade secrets to solicit Churchill's employees for his new employer, Everett Financial dba Supreme Lending ("Supreme"), in violation of binding employment agreements, fiduciary duties, and applicable law. (Dkt. No 1.) Two days later—because Defendant's conduct was ongoing and escalating—Plaintiff moved for a Temporary Restraining Order ("TRO"). (Dkt. Nos. 9, 10.) The Court granted the TRO the same day and set a Preliminary Injunction hearing for July 25, 2025. (Dkt. No. 16.) On July 21, 2025, the parties reached an agreement on a Proposed Agreed Preliminary Injunction, which the Court entered that day. (Dkt. Nos. 20, 21.) The terms matter. Miller agreed that, until May 21, 2026, he "will not directly or indirectly solicit any current employee of Churchill to leave their employment with Churchill or accept employment with another entity, including Supreme." (Dkt. No. 21, ¶ 6). He also agreed to submit his devices for forensic examination by a third-party firm. (Dkt. No. 21, ¶ 3.) Those devices would prove revelatory.

Defendant filed an Answer and Counterclaim on September 8, 2025. (Dkt. No. 27.) On September 29, 2025, the Court entered its Initial Case Management Order. (Dkt. No. 33.) Among other dates, the Order set a deadline of November 29, 2025 for all Motions to Amend Pleadings. (Dkt. No. 33, at ¶ G.) Fact discovery closes on March 31, 2026. (Dkt. No. 33, at ¶ F.)

---

[2] A clean copy of Plaintiff's Second Amended Complaint is attached, as Exhibit 1 hereto, to be recognized as filed should the Court grant this Motion. A redline copy of Plaintiff's Second Amended Complaint comparing the proposed amendment with Plaintiff's First Amended Complaint is attached as Exhibit 2.

Since the Agreed Preliminary Injunction, Churchill has uncovered substantial additional misconduct—not all at once, but in three distinct phases. Each phase revealed new layers of coordinated misconduct that Churchill could not have discovered earlier.

**Phase One: November 2025.** Shortly before the amendment deadline, Churchill discovered that Miller was actively soliciting Lapham and working with her to divert Churchill's business to Supreme. Emails revealed that Lapham, while still employed by Churchill, was referring construction deals to Emily Autore at Supreme and directing Churchill customers to apply for loans through Supreme employees. On November 6, 2025, Lapham and four colleagues from Churchill's Missoula office—Caitlin Peel, Janelle Chase, Jennifer Fauque, and Cheri Henslee—resigned within hours of each other. All five joined Supreme. On November 26, 2025, Churchill moved to amend within the scheduling order deadline to add these facts. (Dkt. Nos. 41, 43.) But at that time, Churchill did not yet know the full extent of Miller and Lapham's coordination—or that Lapham had stolen Churchill's confidential borrower information.

**Phase Two: January 2026.** In January 2026, Churchill received the forensic examination results from Miller's devices—the very examination mandated by the Agreed Preliminary Injunction. (Dkt. No. 21.) The results exposed a conspiracy far deeper than Churchill had understood. Text messages revealed that on June 1, 2025, Miller had instructed Lapham on how to steal Churchill's confidential information and trade secrets without detection. He told her not to plug external drives into her computer, not to "run any reports in Encompass," and not to download or email Churchill documents to personal accounts. Instead, he directed her to photograph data and use ChatGPT to convert images into spreadsheets and contacts. Miller pushed Lapham to obtain Churchill's customer database, pipeline information, and subcontractor and general-contractor data. In late June 2025, Miller coordinated travel for Lapham to meet with Supreme's

3

leadership. On June 21, 2025, Miller discussed a detailed transition plan, telling Lapham he "sat with Michael Tirio yesterday and we have a plan for transition for all the people with his team" and offering to "bring Cherie and myself to town and stay a week and Janell all together and onboarding team." These facts were unknown to Churchill when it filed the First Amended Complaint. They could not have been discovered without the forensic examination.

**Phase Three: February 10, 2026.** On February 10, 2026, Churchill received an email from a borrower who had completed a construction loan with Churchill in November 2025. The borrower reported receiving a solicitation mailing from "Stonepath Mortgage" in Missoula—Lapham's team at Supreme—that included not only a marketing flyer but also a copy of the borrower's Churchill Closing Disclosure, a document containing nonpublic personal information. The borrower was "disturbed" and asked Churchill to explain how their private information had been shared. Churchill immediately investigated. By February 11, 2026, Churchill confirmed that the closing disclosure Lapham used was a Churchill-originated document identifying Churchill as the lender and listing Lapham's Churchill contact information and NMLS ID.[3] Churchill also identified at least eight additional borrowers whom Lapham had contacted using Churchill's information.

Upon learning of Lapham's post-resignation use of Churchill's borrower information, on February 11, 2026, Churchill sent a cease-and-desist letter to Supreme's counsel demanding that, amongst other things, Lapham cease her solicitations, cease using Churchill-originated documents,

---

[3] An NMLS ID is number that represents a unique identifier "permanently assigned by the Nationwide Multistate Licensing System (NMLS) for each company." NMLS, NMLS Unique Identifier, https://mortgage.nationwidelicensingsystem.org/knowledge/products/nmls/pubs/aboutNMLS/reference/aboutNMLS/maps/topics/nmls_uniqueID-1.html (last accessed March 6, 2026).

preserve and forensically image her devices, identify and quarantine Churchill data in Supreme's systems, and certify compliance on a schedule that ran through February 27, 2026. As of the date of this filing, neither Supreme nor Lapham has complied, and Churchill has not received the requested information or assurances.

The three phases establish that amendment is necessary to add Lapham as a defendant and to conform the pleadings to the full scope of the misconduct. The facts emerged in stages: first through emails discovered in November 2025, then through the forensic examination of Miller's devices in January 2026, and finally through the borrower's complaint on February 10, 2026. Because these facts emerged through discovery and investigation conducted after the November 29, 2025 amendment deadline, Plaintiff could not have included them in the First Amended Complaint despite the exercise of diligence.

Plaintiff brings the instant Motion seeking: (1) relief from the Scheduling Order under Rule 16(b)(4); (2) leave to file a Second Amended Complaint under Rule 15(a)(2); and (3) joinder of Lapham as a defendant under Rule 20(a)(2). The proposed amendment adds Lapham as a defendant, supplements existing factual allegations concerning Miller's conduct, and asserts additional claims and requested injunctive relief necessary to address Defendants' ongoing misconduct, including Lapham's misappropriation and misuse of Churchill's confidential borrower information in violation of her employment agreements and the Gramm-Leach-Bliley Act.

## ARGUMENT

### A. Legal Standards

#### 1. Modifying the Scheduling Order Under Rule 16(b)(4)

Because the November 29, 2025 deadline for amending pleadings has passed, Plaintiff must first demonstrate good cause under Rule 16(b)(4) before the Court may consider whether leave to amend is proper under Rule 15(a). *See Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003); *see also Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 879 (6th Cir. 2020). Rule 16 ensures that "at some point both the parties and the pleadings will be fixed." *Leary*, 349 F.3d at 906.

The "touchstone" of the good cause inquiry is "whether the moving party acted diligently in attempting to meet the deadline set forth in the pretrial order." *United States v. Care Servs. Mgmt. LLC*, No. 3:17-cv-01478, 2025 WL 1691905, at *1 (M.D. Tenn. June 13, 2025) (Trauger, J.). Another important consideration is whether the opposing party will suffer prejudice. *Leary*, 349 F.3d at 906. This Court has found good cause where a plaintiff sought to allege facts that "came to light only through 'discovery produced ... shortly before the filing of the Motion to Amend.'" *VanStory v. Am. Health Partners Mgmt. LLC*, No. 3:24-cv-00945, 2025 WL 2585679, at *4 (M.D. Tenn. Sept. 5, 2025) (quoting *Care Servs. Mgmt.*, 2025 WL 1691905, at *4). As this Court has recognized, "it is understandable that some discovery might be necessary in order for the parties to appreciate fully the scope of claims and defenses." *Id.* (quoting *Kellogg Co. v. FPC Flexible Packaging Corp.*, No. 1:11-cv-272, 2012 WL 769476, at *3 (W.D. Mich. Mar. 7, 2012)).

Courts weigh several factors: (1) when the moving party learned of the issue; (2) how the newly discovered evidence is necessary and material; (3) the length of the discovery period; (4) whether the moving party was dilatory; and (5) whether the adverse party was responsive to discovery requests. *Bentkowski v. Scene Mag.*, 637 F.3d 689, 696 (6th Cir. 2011). But the central

question is whether a party acted diligently. *Dowling v. Cleveland Clinic Found.*, 593 F.3d 472, 478 (6th Cir. 2010).

   2. *Leave to Amend Under Rule 15(a)(2)*

Once a movant clears the Rule 16 good cause hurdle, the Court considers whether the proposed amendment is permissible under Rule 15. *Leary*, 349 F.3d at 909. Rule 15(a)(2) provides that courts "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). This standard reflects a liberal amendment policy. *Brown v. Chapman*, 814 F.3d 436, 442-43 (6th Cir. 2016). The Supreme Court's decision in *Foman v. Davis* remains the anchor. If a plaintiff's underlying facts "may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." 371 U.S. 178, 182 (1962). In the absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice, or futility, leave "should, as the rules require, be 'freely given.'" *Id.* Delay alone does not justify denial. *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002). A proposed amendment is futile only if it could not withstand a Rule 12(b)(6) motion to dismiss. *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000).

Where a court has already found no undue delay or prejudice under Rule 16's "much stricter" good cause standard, Rule 15's requirements are likewise satisfied. *VanStory*, 2025 WL 2585679, at *5.

   3. *Joinder of Parties Under Rule 20(a)(2)*

Rule 20(a)(2) permits joinder of defendants in a single action if: (A) any right to relief is asserted against them "jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences"; and (B) any question of law or fact common to all defendants will arise in the action. Fed. R. Civ. P. 20(a)(2).

In the Sixth Circuit, the words "transaction or occurrence" receive "a broad and liberal interpretation in order to avoid a multiplicity of suits." *VanStory*, 2025 WL 2585679, at *6. The inquiry focuses not on whether claims arise from the same discrete event, but on "the similarity in the factual background of the claims." *Proctor v. Applegate*, 661 F. Supp. 2d 743, 779 (E.D. Mich. 2009). The purpose of Rule 20(a) is "to promote judicial economy and trial convenience." *Hammond-Beville v. Landis*, No. 3:20-cv-00973, 2022 WL 16950277, at *3 (M.D. Tenn. Nov. 15, 2022). Judicial economy is served by trying related claims together. *VanStory*, 2025 WL 2585679, at *6.

### B. Churchill Demonstrates Good Cause Under Rule 16(b)(4)

Churchill satisfies Rule 16(b)(4)'s good cause standard. The facts supporting this Motion emerged in three distinct phases—each through discovery and investigation conducted after the November 29, 2025 deadline. Churchill acted diligently at every stage, moving to amend promptly after discovering new facts. No party will be prejudiced.

  1. *Churchill Acted Diligently*

This Court has found good cause where a plaintiff "sought to allege facts that came to light only through 'discovery produced ... shortly before the filing of the Motion to Amend.'" *VanStory*, 2025 WL 2585679, at *4 (quoting *Care Servs. Mgmt.*, 2025 WL 1691905, at *4). That is precisely what occurred here.

<u>Phase One: November 2025</u>. When Churchill first learned that Miller was soliciting Lapham and coordinating the diversion of Churchill's business to Supreme, Churchill acted promptly. On November 26, 2025—within the scheduling order deadline—Churchill moved to amend to add facts concerning Miller's solicitation of Lapham and the coordinated November 6, 2025 resignations. (Dkt. Nos. 41, 43.) At that time, however, Churchill did not know the full extent

8

of Miller and Lapham's coordination or that Lapham had stolen Churchill's confidential borrower information.

Phase Two: January 2026. In January 2026, Churchill received the forensic examination results from Miller's devices pursuant to the Agreed Preliminary Injunction. (Dkt. No. 21.) The forensic examination produced Miller's text messages—and those messages revealed a far deeper conspiracy than Churchill had understood. Miller had instructed Lapham on how to steal Churchill's confidential information without detection. He coached her to photograph data and use ChatGPT to convert images into spreadsheets. He coordinated with Supreme's leadership on a detailed transition plan for Lapham and her team. These facts were unknown to Churchill when it filed the First Amended Complaint. They could not have been discovered without the forensic examination.

Phase Three: February 10, 2026. On February 10, 2026, a borrower reached out to Churchill with a disturbing report. The borrower had completed a construction loan with Churchill in November 2025. Now, months later, that same borrower received a solicitation mailing from "Stonepath Mortgage" in Missoula—Lapham's team at Supreme. The mailing included not just a marketing flyer, but something far more troubling: a copy of the borrower's Churchill Closing Disclosure, a document containing nonpublic personal information. The borrower wanted answers. Churchill moved immediately. By February 11, 2026, Churchill confirmed that the closing disclosure Lapham used was a Churchill-originated document—one identifying Churchill as lender, listing Lapham's Churchill contact information, and bearing Lapham's Churchill NMLS ID. Churchill identified at least eight additional borrowers whom Lapham had contacted using Churchill's information. That same day, Churchill sent a cease-and-desist letter to Supreme's counsel. This Motion followed promptly.

The timeline here tracks *Hahn v. State Farm Fire and Casualty Co.* There, the court found good cause because the plaintiff "did not learn of [the critical] communication until February 27, 2025," when it emerged in another proceeding and then filed to amend just seven days later. No. 3:24-cv-280-RGJ, 2025 WL 3017429, at *4 (W.D. Ky. Oct. 28, 2025). Churchill's posture is the same. Churchill learned of Lapham's misuse of borrower information on February 10, 2026, and moved to amend within weeks—and this was after Churchill sent a cease-and-desist letter to Supreme's counsel demanding compliance, *see supra*, an attempt to resolve it out of Court. The law does not demand clairvoyance. Churchill "could not have amended the pleading by [the deadline] to incorporate information it learned in discovery in [2026]." *Care Servs. Mgmt.*, 2025 WL 1691905, at *3.

2. *The Newly Discovered Evidence Is Necessary and Material*

The newly discovered evidence is not peripheral. It is essential—both to Churchill's claims and to obtaining complete relief. Miller's June 1, 2025 instructions to Lapham establish premeditation: a coordinated conspiracy to misappropriate Churchill's confidential information and trade secrets. Lapham's theft and ongoing misuse of Churchill's borrower nonpublic personal information—including the Churchill closing disclosures she used to solicit Churchill's own customers—demonstrates violations of the Gramm-Leach-Bliley Act and her employment agreements. Without amendment, Churchill cannot add Lapham as a defendant. Without amendment, Churchill cannot obtain the injunctive relief necessary to halt the ongoing misconduct. As this Court has recognized, "it is understandable that some discovery might be necessary in order for the parties to appreciate fully the scope of claims and defenses." *VanStory*, 2025 WL 2585679, at *4. That is precisely what happened here.

10

Case 3:25-cv-00765    Document 61    Filed 03/06/26    Page 10 of 17 PageID #: 468

3. *Sufficient Time Remains in Discovery*

Fact discovery does not close until March 31, 2026. (Dkt. No. 33, at ¶ F.) More than one month remains for any targeted discovery regarding Lapham's conduct. Time is not the problem here.[4] This Court found no prejudice in *Care Services Management* even where the motion to amend was filed "just days before the expiration of the discovery deadline," because "there is ample time for such discovery if the defendants think it is necessary." 2025 WL 1691905, at *2. *VanStory* reinforced the point: "even if the defendant's claim that written discovery had ended were true," the fact that the court had "granted two jointly filed motions to extend discovery deadlines" mitigated any claimed prejudice. 2025 WL 2585679, at *5. Here, with more than one month remaining, time is no obstacle.

4. *No Prejudice to Opposing Party*

Miller will not be prejudiced. He cannot be. The claims against Lapham arise from the same coordinated scheme already at the heart of this litigation: the conspiracy to solicit Churchill's employees and customers, to misappropriate Churchill's confidential information. The issues are not new to this case—they are already within the scope of ongoing discovery regarding Miller's solicitations and Supreme's involvement. And here is the irony that cannot be ignored: the forensic examination of Miller's own devices—conducted pursuant to the Agreed Preliminary Injunction that Miller himself consented to—produced the text messages revealing his coordination with Lapham. Miller cannot now claim prejudice from evidence his own agreement compelled him to produce.

---

[4] On February 13, 2026, the Court stayed all deadlines pending mediation scheduled for February 26, 2026, and indicated that if the case does not settle, the Court will reschedule the trial upon the parties' joint motion. (Dkt. No. 56.)

11

This Court has rejected boilerplate prejudice arguments before. In *VanStory*, the defendant argued that granting the motion "would cause undue delay as the parties have completed most of discovery except depositions." This Court was unpersuaded: such a "boilerplate statement about delay is unconvincing, especially because of the prejudice to the plaintiff that could result from litigating two cases." 2025 WL 2585679, at *5. The same logic applies here. Denying amendment would force Churchill to bring a separate action against Lapham—duplicative litigation over the same facts, with the risk of inconsistent findings on overlapping conduct. Courts routinely reject prejudice arguments when the party opposing amendment is the source of the delay. *Hahn*, 2025 WL 3017429, at *5. Miller agreed to the forensic examination. Miller's devices produced the evidence. Miller cannot now be heard to complain. Churchill has demonstrated good cause.

C. **The *Foman* Factors Support Amendment Under Rule 15(a)(2)**

Having satisfied Rule 1's "much stricter" good cause standard, Churchill clears the Rule 15 hurdle as well. *VanStory*, 2025 WL 2585679, at *5. Where a court finds no undue delay or prejudice under Rule 16, Rule 15's requirements follow. The *Foman* factors confirm what the good cause analysis already established: amendment is proper.

1. *No Undue Delay or Bad Faith*

Churchill moved promptly. Always. Churchill filed its First Amended Complaint within the scheduling order deadline in November 2025. The facts uncovered in January 2026—Miller's text messages—could not have been discovered earlier. The facts uncovered in February 2026—Lapham's misuse of borrower documents—could not have been discovered earlier. Churchill brought this Motion promptly after the February 10, 2026 borrower complaint. Delay alone does not justify denial. *Morse*, 290 F.3d at 800. There was no delay here worth the name.

This amendment is not strategy. It is necessity. Churchill sought the forensic examination through the Agreed Preliminary Injunction back in July 2025—long before it knew what the examination would reveal. When the borrower's complaint arrived, Churchill investigated immediately and sent a cease-and-desist letter the next day. This is Churchill's second amendment—not a pattern of deficient pleading, but a measured response to facts as they emerged. Each amendment traces to new evidence. Each amendment is grounded in the record.

2. *No Undue Prejudice*

The case remains in early stages. Fact discovery is currently slated to run until March 31, 2026, and the Court has already stayed all deadlines. *See supra* n. 4. The claims against Lapham arise from the same coordinated scheme as the claims against Miller—same conspiracy, same confidential information, same pattern of misconduct. Discovery already encompasses the relevant conduct. This Court found no prejudice in similar circumstances. *VanStory*, 2025 WL 2585679, at *5; *Care Servs. Mgmt.*, 2025 WL 1691905, at *4. There is no prejudice here.

3. *No Futility*

Futility is a high bar. A proposed amendment is futile only if it "could not withstand a Rule 12(b)(6) motion to dismiss." *Rose*, 203 F.3d at 420. Miller has not challenged the sufficiency of Churchill's claims—he answered the Complaint and agreed to the Preliminary Injunction. The proposed amendment does not speculate. It documents. Miller's text messages show his instructions to Lapham. Emails show coordination and business diversion. Churchill closing disclosures attached to Lapham's solicitation mailings prove misuse of confidential information. These facts support claims for trade secret misappropriation, breach of employment agreements, and Gramm-Leach-Bliley Act violations. In *Grand Isle Games*, this Court declined to conduct extensive futility analysis at the motion to amend stage. No. 3:25-cv-00390, 2025 WL 2324079, at

*2-3 (M.D. Tenn. Aug. 12, 2025). The well-pleaded facts here leave no room for a futility finding. Churchill has satisfied Rule 15(a)(2)'s liberal standard.

### D. Lapham Is Properly Joined Under Rule 20(a)(2)

Lapham's joinder satisfies both prongs of Rule 20(a)(2). The claims arise from the same series of transactions. Common questions of law and fact pervade. And joinder serves the very purpose Rule 20 was designed to advance: judicial economy and trial convenience.

#### 1. Same Transaction, Occurrence, or Series of Transactions or Occurrences

The Sixth Circuit construes "transaction or occurrence" broadly-and for good reason: to "avoid a multiplicity of suits." *VanStory*, 2025 WL 2585679, at *6. The inquiry is not mechanical. It focuses on the "similarity in the factual background of the claim." *Proctor*, 661 F. Supp. 2d at 779. Here, the factual background is not merely similar. It is identical. Miller recruited Lapham in June 2025. Miller instructed Lapham how to steal Churchill's data without detection. Miller coordinated Lapham's meetings with Supreme's leadership. Lapham, in turn, solicited her Missoula team while still on Churchill's payroll. On November 6, 2025, she and four colleagues resigned within hours of each other—and all five joined Supreme. After departing, Lapham used stolen Churchill data to solicit Churchill's borrowers. This is not a collection of unrelated events. It is a single, continuous course of misconduct stretching from June 2025 through February 2026. Same scheme. Same confidential information. Same defendants.

#### 2. Common Questions of Law and Fact

The common questions write themselves. On the facts: What confidential information did Defendants misappropriate? When did the conspiracy begin? What customer and borrower data did Defendants steal? How did Defendants coordinate the team departures? On the law: What constitutes Churchill's trade secrets under Tennessee law? What are the scope and enforceability

14

of Churchill's employment agreements? What duties did Defendants owe Churchill as employees? What constitutes misuse of nonpublic personal information under the Gramm-Leach-Bliley Act? These questions will arise regardless of whether Lapham is joined. Trying them together promotes efficiency—and prevents the inconsistent findings that separate litigation would risk.

    3. *Joinder Promotes Judicial Economy and Avoids Duplicative Litigation*

Rule 20 exists for a reason: "to promote judicial economy and trial convenience." *Hammond-Beville*, 2022 WL 16950277, at *3. That purpose is served by trying related claims together. *VanStory*, 2025 WL 2585679, at *6. Separate trials would mean duplicative discovery on the same facts. Separate trials would risk inconsistent findings on the same conduct. In *VanStory*, this Court permitted joinder of a new defendant precisely to avoid "litigating two cases." *Id.* at *5. The same logic compels the same result here. Churchill satisfies all requirements for joinder under Rule 20(a)(2).

## CONCLUSION

For the foregoing reasons, Churchill respectfully requests that the Court: (1) grant relief from the Scheduling Order under Rule 16(b)(4); (2) grant leave to file the Second Amended Complaint under Rule 15(a)(2); and (3) permit joinder of Lapham as a defendant under Rule 20(a)(2). The proposed Second Amended Complaint, attached as Exhibit 1, should be deemed filed as of the date this Motion is granted.

Dated: March 6, 2026

                        Respectfully submitted,

                        */s/ Lucas A. Markowitz*
                        Lucas A. Markowitz, Esq. (admitted *pro hac vice*)
                        Sean Hennessy, Esq. (admitted *pro hac vice*)
                        Arielle Stephenson (admitted *pro hac vice*)
                        **MITCHELL SANDLER PLLC**
                        2020 K Street NW, Suite 760

Washington, DC 20006
Office: (202) 886-5260
lmarkowitz@mitchellsandler.com
shennessy@mitchellsandler.com
astephenson@mitchellsandler.com

Stephen H. Price, TN Bar No. 014658
**JACKSON LEWIS, P.C.**
611 Commerce Street, Suite 2803
Nashville, TN 37203
Office: (615) 565-1661
stephen.price@jacksonlewis.com
***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2026, the foregoing Plaintiff Churchill Mortgage Corporation's Opposed Motion for Leave to File Second Amended Complaint, to Add Julie Lapham as a Defendant, and for Relief from the Scheduling Order was filed with the Clerk of the Court for the United States District Court for the Middle District of Tennessee using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Lucas A. Markowitz
Lucas A. Markowitz, Esq.