**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

CHURCHILL MORTGAGE CORPORATION

                Plaintiff,

      v.

JEFFREY MILLER,

                Defendant.

Civil Action No. 3:25-cv-00765

Judge Aleta A. Trauger

## PLAINTIFF CHURCHILL MORTGAGE CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR CONTEMPT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT..................................................................................................1

PROCEDURAL BACKGROUND.........................................................................................2

ARGUMENT.............................................................................................................................4

    A.   Defendant Continues to Violate the Agreed Preliminary Injunction Order........................4

        1.   Defendant Communicated Confidential Information to Supreme Recruiters to Indirectly Solicit Hoxworth............................................................................................4

        2.   Defendant and Edwards Are Inextricably Connected....................................................5

        3.   Miller Deploys Edwards to Solicit Andrew Wagner.......................................................6

    B.   Defendant is in Civil Contempt for Violating the Agreed Preliminary Injunction Order...8

        1.   Miller's Actions Satisfy Every Element for Civil Contempt.........................................8

        2.   Plaintiff Must Be Sanctioned for Violating the Injunction ...........................................11

CONCLUSION.......................................................................................................................14

**Cases**

*CFE Racing Prods, Inc. v. BMF Wheels, Inc.,*
    793 F.3d 571 (6th Cir. 2015) ............................................................................... 8

*Elec. Workers Pension Trust Fund of Local Union # 58, IBEW v. Gary's Elec. Serv. Co.,*
    340 F.3d 373 (6th Cir. 2003) .......................................................................... 8, 12

*Grace v. Ctr. for Auto Safety,*
    72 F.3d 1236 (6th Cir. 1996) ............................................................................... 9

*In re Jaques,*
    761 F.2d 302 (6th Cir. 1985) ............................................................................... 8

*Liberte Capital Grp., LLC v. Capwill,*
    462 F.3d 543 (6th Cir. 2006) ............................................................................... 9

*McMahan & Co. v. Po Folks, Inc.,*
    206 F.3d 627 (6th Cir. 2000) ............................................................................. 12

*Nat'l Labor Relations Bd. v. Bannum, Inc.,*
    93 F.4th 973 (6th Cir. 2024) ......................................................................... 8, 12

*NLRB v. Cincinnati Bronze, Inc.,*
    829 F.2d 585 (6th Cir. 1987) ............................................................................... 8

*NLRB v. Lynair, Inc.,*
    380 F.2d 286 (6th Cir. 1967) ............................................................................. 12

*Redken Lab., Inc. v. Levin,*
    843 F.2d 226 (6th Cir. 1988) ....................................................................... 12, 13

*Rolex Watch U.S.A., Inc. v. Crowley,*
    74 F.3d 716 (6th Cir. 1996) ................................................................................. 8

*SLS Franchise Sys. LLC v. Mid-State Lawn Servs. LLC,*
    2021 WL 6804170 (W.D. Tenn. Sept. 30, 2021) ............................................... 12

*Sony/ATV Music Publishing LLC v. 1729172 Ontario, Inc.,*
    2016 WL 7407309 (M.D. Tenn. Dec. 22, 2016) ............................................... 12

*United States v. United Mine Workers of Am.,*
    330 U.S. 258 (1947) .......................................................................................... 12

*Wyndham Vacation Resorts, Inc. v. TOA, LLC*,

    2010 WL 4024066 (M.D. Tenn. Oct. 12, 2010) ........................................................................ 13

iv

Plaintiff Churchill Mortgage Corporation ("Churchill" or "Plaintiff") respectfully submits this memorandum of law in support of its Motion for Contempt against Defendant Jeffery Miller ("Defendant" or "Miller"). In support thereof, Churchill avers as follows:

## PRELIMINARY STATEMENT

As the old saying goes, if it looks like a duck, walks like a duck, and quacks like a duck—it's a duck. This Court need not squint to see what Miller is doing. The evidence walks. The evidence talks. The evidence unmistakably reveals a man prohibited from soliciting Churchill employees and then, with calculated precision, set about doing precisely that.

Miller cannot solicit Churchill employees himself—the Agreed Preliminary Injunction Order (the "Injunction Order") (Dkt. No. 21) forbids it. So, Miller found another way.

First, Miller provided confidential insights and information about then current Churchill employee Richard Hoxworth ("Hoxworth") to a Supreme Lending ("Supreme") recruiter. The Supreme recruiter then used that very information to successfully solicit Hoxworth to Supreme *after* the Injunction Order was already in place. Thus, Miller found a workaround to the Injunction Order—using a Supreme recruiter—to indirectly solicit Hoxworth by using his knowledge of Churchill employees and its confidential performance data to assist Supreme in its recruitment efforts.

Second, and more recently, he recruited his longtime friend, his former direct report, his trusted colleague, Andrew Edwards ("Edwards") to Supreme. And once Edwards arrived, he did exactly what Miller could not: he reached out to Churchill's second highest-grossing producer with an invitation to jump ship.

Coincidence? Hardly. Edwards never once contacted a Churchill employee before joining Supreme after he left Churchill. Yet weeks after Miller brought him aboard, Edwards was texting

Churchill's top talent. The timing is not suspicious; it is damning. The pattern is not circumstantial; it is calculated. Miller may not have typed the message, but his fingerprints are all over it.

This is not a close call. Miller knew the rules. Miller agreed to the rules. Miller broke the rules—providing Churchill's confidential information to Supreme recruiters for their recruitment efforts and using Edwards as his instrument, his proxy, and his puppet. The Injunction Order prohibits both direct and indirect solicitation. What Miller has communicated to Supreme recruiters and orchestrated through Edwards is indirect solicitation, pure and simple. If it looks like a violation, acts like a violation, and achieves the purpose of a violation, this Court should call it what it is.

## PROCEDURAL BACKGROUND

On July 9, 2025, Churchill filed a complaint against Defendant asserting claims arising from Defendant's scheme to use misappropriated confidential information and trade secrets to solicit Plaintiff's employees for his new employer, Supreme Lending, in violation of binding employment agreements, fiduciary duties, and applicable law. (Dkt. No 1.) Two days later–because Defendant's conduct was ongoing and escalating–Plaintiff moved for a Temporary Restraining Order ("TRO"). (Dkt. Nos. 9, 10.) The Court granted the TRO the same day and set a Preliminary Injunction hearing for July 25, 2025. (Dkt. No. 16.) On July 21, 2025, while preparing for the scheduled hearing, the parties reached an agreement on a Proposed Agreed Preliminary Injunction, which the Court entered that same day. (Dkt. Nos. 20 and 21.)

The terms of that order could not have been clearer. Defendant agreed that, until May 21, 2026, he "will not directly or indirectly solicit any current employee of Churchill to leave their employment with Churchill or accept employment with another entity, including Supreme." (Dkt. No. 21, ¶ 6.) Directly. Indirectly. Both are forbidden. No exceptions.

Defendant filed an Answer and Counterclaim on September 8, 2025. (Dkt. No. 27.) On September 29, 2025, the Parties participated in a case management conference and later that day, the Court entered a Scheduling Order requiring all motions to amend to be filed by November 29, 2025. (Dkt. No. 33, at ¶ G.) On October 13, 2025, Plaintiff filed a Motion to Strike the Answer and a Motion to Dismiss the Counterclaim. (Dkt. Nos. 35, 36.) While these motions were pending, the parties engaged in settlement discussions, leading Defendant to seek and obtain an extension of time to respond. (Dkt. No. 37, 38.) Those discussions, however, were undermined when Plaintiff discovered that, despite the clear prohibitions in the Injunction Order, Defendant was again, directly or indirectly, soliciting Churchill employees to join Supreme and working with those employees to divert Churchill customers. (Dkt. No. 43, ¶¶ 98-110.) Because of the new solicitations, Plaintiff sought, and the Court granted, motion for leave to amend. (Dkt. Nos. 41, 42.) On December 1, 2025, Plaintiff filed its Verified First Amended Complaint (Dkt. No. 43.) and Defendant filed an Answer and Counterclaim on December 15, 2025. (Dkt. No. 47.)

On January 12, 2026, Plaintiff filed its Motion to Dismiss Defendant's Counterclaims, Defendant filed his response on January 26, 2026 (Dkt. No. 51), and Plaintiff filed a reply on February 2, 2026. (Dkt. No. 53.) On February 13, 2026, the Parties filed a Joint Status Report and Request for Status Conference advising the Court that the Parties had agreed to mediate the dispute and scheduled mediation for February 26, 2026. (*See* Dkt. No. 54, ¶ 2.) That same day, the Court held a telephone conference with the Parties and stayed all deadlines "pending mediation." (Dkt. No. 56.) Unsurprisingly, Defendant *yet again* undermined potential settlement and mediation discussions when Plaintiff discovered on February 19, 2026, that Defendant was indirectly soliciting current Churchill employees through Edwards. Plaintiff promptly notified the Court of the violation of the Injunction Order and that Plaintiff could not proceed with the mediation in

good faith while Defendant continued to engage in the conduct the Court had enjoined. (*See* Dkt. No. 57.) Defendant subsequently filed a Motion to Strike and for Sanctions in response to Plaintiff's letter to the Court. (Dkt. Nos. 58, 59.)

## ARGUMENT

### A. Defendant Continues to Violate the Agreed Preliminary Injunction Order

Defendant is deliberately flouting his legal obligations imposed by this Court. Despite crystal clear prohibitions in the Injunction Order, Defendant has continued to attempt to poach Churchill's employees, only this time Defendant's tactic has grown more sophisticated—he is now using Supreme recruiters and Edwards to *indirectly* solicit for him.

### 1. Defendant Communicated Confidential Information to Supreme Recruiters to Indirectly Solicit Hoxworth

As soon as Miller joined Supreme in June 2025, he began assisting Supreme recruiters in targeting Churchill employees and sharing confidential employee information that enabled Supreme to recruit Churchill's employees.

In June 2025, Miller provided Churchill's confidential performance data to assist Supreme in its indirect solicitation and recruitment of Richard Hoxworth, a Churchill employee based in Waco, Texas. On June 3, 2025, Jeremy Ask, a Supreme recruiter, reached out to Miller asking if he knew "Richard Hoxworth, Churchhill [sic] guy in Waco." (Declaration of L. Markowitz, Exhibit 1, at Exhibit A.) Miller confirmed he knew Bill Harp, whom Hoxworth "came with," and offered to help, stating "How can I help?" (*Id*.) Miller provided information about Hoxworth's status at Churchill, including that "He started 4/8 no applications." Miller also provided insights about Churchill's reporting, noting that Hoxworth's production data was "prob accurate the last reporting I saw from lone star region." (*Id*.) Ask requested that Miller not text Harp "if this isn't public info,"

demonstrating awareness that Miller was providing confidential Churchill information for the purpose of soliciting. (*Id.*)

On August 29, 2025, after the Injunction Order was in place, Hoxworth resigned from Churchill and joined Supreme, where he now works as a Branch Manager. (*See* Ex. 1, Decl. L. Markowitz, at Ex. B (Supreme Lending Instagram Post (Sept. 2025).) The above exchange demonstrates that Hoxworth's departure was a *direct result* of Miller's indirect solicitation. Miller used his knowledge of Churchill employees and their confidential performance data to assist Supreme in its recruitment efforts, even after the Injunction Order was in place. Without Miller spilling Churchill's trade secret and confidential information to Supreme recruiters, Supreme would not have had the ammunition and knowledge needed to successfully solicit Hoxworth.

### 2. Defendant and Edwards Are Inextricably Connected

As he did before, Miller used his knowledge of Churchill confidential information to work around the Injunction Order, but this time by using Edwards. Miller and Edwards are not casual acquaintances who happened to end up at the same company. They are not former colleagues whose paths merely crossed. They are something far more significant: they are a team. They have worked together–side by side, supervisor and subordinate–for over a decade.

The history speaks for itself. From 2012 to 2014, both worked at Rivermark Community Credit Union. From 2014 to 2019, both worked at Director's Mortgage, where Miller supervised Edwards directly. (*See* Declaration of Sheree Bartlett, attached hereto as Exhibit 2, ¶¶ 4–5.) When Miller joined Churchill in 2019, he did not come alone–he brought Edwards with him as part of his team. (*Id.*, ¶¶ 6-7.) At Churchill, Miller served as Vice President of the Northwest Region and Edwards reported directly to him as the Marketing Program Manager, Northwest Region. (*Id.*) Edwards recruited loan officers. Edwards coached loan officers. Edwards worked with every loan

officer in the region on their marketing programs—all under Miller's direct supervision. (*Id.*, at ¶ 7.)

This is not a professional relationship. This is a partnership. This is loyalty forged over years, across companies, and through market cycles. And when Miller needed someone to do what he could not—to reach out to Churchill employees in violation of a court order—he knew exactly whom to call.

### 3. *Miller Deploys Edwards to Solicit Andrew Wagner*

The timeline tells the story. Churchill terminated Edwards in August 2023 due to market conditions. (*Id.*, at ¶ 8.) Edwards then took years away from working directly for industry mortgage lenders. (*See* Ex. 1, Markowitz Decl., at Ex. C (Andrew Edwards LinkedIn Profile).) Churchill terminated Miller on May 21, 2025. (Ex. 2, Bartlett Decl., ¶ 9.) By June 4, 2025, Miller was at Supreme. (*Id.*, ¶ 10.) And by September 2025—just weeks after this Court entered the Injunction Order prohibiting Miller from soliciting Churchill employees—Edwards was at Supreme too. (*See* Ex. 1, Markowitz Decl., at Ex. D (Supreme Lending's LinkedIn Post).)

Why would Supreme hire Edwards? How did Supreme know about Edwards who had been out of the industry for years? What value does a former marketing director bring to a mortgage company—unless that marketing director happens to know every loan officer at Churchill, their production numbers, their compensation, and their vulnerabilities? Why would they hire him only *after* the injunction was entered? Because Edwards was not hired to do marketing. Edwards was hired to do what Miller cannot.

And that is precisely what happened. On February 17, 2026, Edwards sent a text message to Andrew Wagner ("Wagner")—Churchill's second highest-producing loan officer. (*See* Declaration of Benjamin Delery, attached hereto as Exhibit 3, ¶ 4; Ex. 2, Bartlett Decl., ¶ 12.) The

message was not subtle. Edwards announced that he had "teamed up with Supreme Lending" and asked whether Wagner would be "open to a conversation to explore what the benefits could be [at Supreme]." (*Id.*, ¶ 4; *see also below.*)



> Today 6:07 AM
>
> Andrew! Saw some Orioles highlights last night and made me think of you. One of my favorite nights at that game together!
>
> I've been running my own business the last couple years but I also teamed up with Supreme Lending recently. Would be awesome to work together again! Let me know if you'd be open to a conversation just to explore what the benefits could be!
>
> The above was received by Andrew Wagner from Andrew Edwards

Wagner then forwarded the message to Benjamin Delery ("Delery"), National Production Support at Churchill, in order to notify him of the solicitation. (Ex. 3, Delery Decl., ¶ 4; Ex. 2, Bartlett Decl., ¶ 13.) Delery immediately forwarded Edwards' message to Matt Clarke, President and CEO of Churchill. (*Id.*, at ¶ 5.)

Edwards did not reach out to Churchill employees prior to him being recruited to join Supreme by Miller. But now that Miller cannot directly solicit Churchill employees, Edwards is conveniently soliciting Churchill employees. Edward's solicitations can only be attributed to a direct mandate from Miller in order for Miller to circumvent the Injunction Order.

**B. Defendant is in Civil Contempt for Violating the Agreed Preliminary Injunction Order**

Why do courts issue injunctions? Why do parties agree to them? Because words on paper must mean something. Because court orders must carry weight. Because without enforcement, the rule of law becomes mere suggestion.

*1. Miller's Actions Satisfy Every Element for Civil Contempt*

Contempt proceedings are used to "enforce the message that court orders and judgments are to be complied with in a prompt manner." *Elec. Workers Pension Trust Fund of Local Union # 58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 378 (6th Cir. 2003) (citing *NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 590 (6th Cir. 1987)). "A court's ability to issue injunctions, and then enforce those injunctions with a finding of contempt, springs from the court's inherent equitable powers." *CFE Racing Prods, Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 598 (6th Cir. 2015) (citation and quotation marks omitted). Miller agreed to this Court's injunction. Miller violated this Court's injunction. Miller must be held accountable.

The standard is well established. To prove civil contempt, the movant must demonstrate by clear and convincing evidence that the non-movant "violated a definite and specific order of the court." *Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996) (quoting *Cincinnati Bronze.*, 829 F.2d at 591); *see also CFE Racing Prods.*, 793 F.3d at 598 (same). Three elements must be proven: (1) "a definite and specific order of the court requiring [the defendant] to perform or refrain from performing a particular act or acts"; (2) the defendant "had knowledge of the court's order"; and (3) the defendant "violated that order." *Nat'l Labor Relations Bd. v. Bannum, Inc.*, 93 F.4th 973, 979 (6th Cir. 2024) (quoting *Cincinnati Bronze*, 829 F.2d at 591) (quotation marks omitted). Critically, there is no requirement to show intent beyond knowledge of the order. *In re Jaques,* 761 F.2d 302, 306 (6th Cir. 1985). Moreover, the prior order must be "clear and

8

unambiguous" to support a finding of contempt. *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 550-51 (6th Cir. 2006) (quoting *Grace v. Ctr. for Auto Safety*, 72 F.3d 1236, 1241 (6th Cir. 1996)).

Churchill satisfies every element. And it is not close.

First, there is a "definite and specific" court order that is clear and unambiguous. Specifically, the Court's Injunction Order required that, among other things:

- "Until May 21, 2026", Defendant would "not directly or *indirectly* solicit any current employee of Churchill to leave their employment with Churchill or to accept employment with another entity, including Supreme." (Dkt. No. 21, ¶ 6.) (emphasis added.)

- Miller "will not disclose to any third party, including Supreme, any Churchill trade secrets as that term is defined by the Tennessee Uniform Trade Secrets Act or the Defend Trade Secrets Act." (*Id.*, ¶ 4.)

- Miller "will not disclose to any third party, including his current employer, any information Churchill alleges constitutes its Confidential Information," which is defined to include, among other things, (1) "Financial information including budgets, non-public P&L statements, forecasting, calculators, and strategy plans" and (2) "Current Churchill employee information including non-public compensation information and non-public performance metrics (excluding information exclusively about and pertaining to a specific employee that was provided by that employee, with the consent of that employee, or from public sources outside of Churchill)." (*Id.*)

- Miller "will not use any Churchill Confidential Information or Churchill trade secrets for his own personal gain or for that of Supreme." (*Id.*, ¶ 5.)

Second, Defendant is aware of the express terms and conditions of the injunction entered by agreement on July 21, 2025 (Dkt. No. 21) and cannot allege otherwise.

Third, Defendant violated the order. This is where Miller may protest. He may insist that he personally sent no messages, made no calls, or drafted any emails. Perhaps that is technically true. But the Injunction Order does not merely prohibit direct solicitation—it also prohibits indirect solicitation. (*See* Dkt. No. 21, ¶ 6.) What Miller did through Supreme recruiters and Edwards was indirect solicitation.

Miller's history of communicating with Supreme recruiters to target Churchill employees speaks for itself. Miller knowingly provided confidential information to Supreme recruiters about Hoxworth in order to solicit and recruit him to join Supreme. Although we don't yet know whether Miller contacted Hoxworth directly, Miller's divulgement of Churchill's confidential information provided Supreme recruiters with the knowledge and tools that directly resulted in Hoxworth resigning from Churchill to join Supreme in August 2025—just *after* the Court issued the Injunction Order. (*See* Dkt. No. 21.) Thus, Miller violated the Injunction Order by successfully indirectly soliciting Hoxworth by using his knowledge of Hoxworth and Churchill's confidential performance data to assist Supreme in its recruitment efforts.

Miller didn't stop there. He then did it again with Edwards, but this time his scheme grew because he himself took affirmative steps to indirectly solicit Churchill employees. Trace the scheme. Miller leaves Churchill under a cloud of suspicion. Miller joins Supreme. This Court enters an injunction prohibiting Miller from soliciting Churchill employees. (*See* Dkt. No. 21.) Miller then recruits Edwards—his longtime lieutenant, his trusted subordinate, the man who knows Churchill's loan officers better than anyone outside the company. Within months, Edwards is texting Churchill's second-highest producer with an invitation to defect.

Miller may not have pressed "send," but Miller pulled the strings. Miller recruited Edwards for this purpose. As he did with the Supreme recruiters and the solicitation of Hoxworth, Miller deployed Edwards to do what he himself could not. Edwards had never contacted Churchill employees before working with Miller at Supreme. Yet now, suddenly, he miraculously does.

Granted, Miller can argue that Edwards acted independently. But that argument requires this Court to believe an extraordinary coincidence: that Edwards, entirely on his own initiative, happened to start recruiting Churchill employees just weeks after reuniting with Miller—the very man prohibited from doing exactly that. It also asks the Court to refuse to acknowledge Miller's pattern of using others to indirectly solicit Churchill employees. The argument asks too much. It defies common sense. It insults this Court's intelligence.

Finally, in further violation of the Injunction Order, Miller used his "knowledge" of Churchill's confidential information and trade secrets "for his own personal gain or for that of Supreme" (Dkt. No. 21, ¶ 5) when he provided confidential information to Supreme recruiters and Edwards in order to solicit Churchill employees. The solicitation of Churchill's employees only benefits Miller and Supreme who will reap the benefits of Miller's continued violations of the Injunction Order. With each Churchill employee that Miller solicits to Supreme—either directly or indirectly—Miller helps Supreme accelerate its growth. Miller and Supreme benefit not only from acquiring Churchill's employees and profits, but also Churchill's confidential trade-secrets— all to Churchill's detriment and Miller and Supreme's gain.

2.  *Plaintiff Must Be Sanctioned for Violating the Injunction*

The remedy for contempt must serve two purposes: coercion and compensation. *See Bannum*, 93 F.4th at 981. The Sixth Circuit has made clear that judicial sanctions in civil contempt proceedings may be imposed "for either or both of two purposes; to coerce the [non-movant] into

compliance with the court's order, and to compensate the [movant] for losses sustained." *Elec. Workers*, 340 F.3d at 379 (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947)). "A court can issue sanctions, including for the entry of violations of a preliminary injunction order, upon finding a litigant in civil contempt." *Sony/ATV Music Publishing LLC v. 1729172 Ontario, Inc.*, No. 3:14-cv-01929, 2016 WL 7407309, at *2 (M.D. Tenn. Dec. 22, 2016) (citation omitted).

"It is well settled that costs may be awarded as a ... part of the remedy to which the complainant is entitled in successfully prosecuting a civil contempt proceeding." *Bannum*, 93 F.4th at 982 (quoting *NLRB v. Lynair, Inc.*, 380 F.2d 286, 289 (6th Cir. 1967)). An "award of attorney fees is appropriate for civil contempt in situations where court orders have been violated." *McMahan & Co. v. Po Folks, Inc.*, 206 F.3d 627, 634 (6th Cir. 2000) (citing *Redken Lab., Inc. v. Levin*, 843 F.2d 226 (6th Cir. 1988)); *see also SLS Franchise Sys. LLC v. Mid-State Lawn Servs. LLC*, No. 2:20-cv-02076-JTF-atc, 2021 WL 6804170, at *9 (W.D. Tenn. Sept. 30, 2021) ("Because Plaintiffs were prejudiced and incurred additional costs in the form of bringing this motion [for contempt] as a result of Defendants' non-compliance [with the preliminary injunction], an award of attorneys' fees and expenses is appropriate").

Both purposes are served here. Miller must be coerced into compliance because he has proven repeatedly that he will not comply on his own. And Churchill must be compensated because Miller's violations have forced Churchill to incur substantial costs: the cost of discovery, the cost of investigation, and the cost of bringing this Motion.

Defendant's continued solicitations in direct violation of the Injunction Order have required Plaintiff to expend costs and attorneys fees to uncover and identify the violations and attempt to remedy the violation by bringing this Motion. As such, Plaintiff asks the Court to award it its

attorneys' fees and costs, as well as monetary sanctions for having to expend resources to uncover Defendant's violation. *See Redken*, 843 F.2d at 228-29 (affirming sanctions for defendant's violation of the permanent injunction that included "expenses in actual attorney's fees associated with" the civil contempt motion); *Wyndham Vacation Resorts, Inc. v. TOA, LLC*, No. 3:09-00899, 2010 WL 4024066, at *3-4 (M.D. Tenn. Oct. 12, 2010) (finding defendants continued to violate the injunction order and awarding plaintiff $290,000 in liquidated damages and attorneys' fees incurred for bringing the motion).

Finally, based on provisions in Miller's final employment agreement with Churchill that Miller executed on or around September 13, 2024 ("Employment Agreement"),[1] the period for the non-solicitation does not run while he is violating the agreement. Specifically, Miller agreed in the Employment Agreement that, for a period of 12 months after the termination of his employment, he "will not on behalf of himself or on behalf of any other person, firm, or entity, directly or indirectly solicit" anyone employed by Churchill to leave Churchill or form or join another entity. (Ex. 4 at ¶ V(F).) The Employment Agreement further states that this 12-month period does not "include any period(s) of violation or period(s) of time required for litigation to enforce the covenants herein." (*Id.*) Although Miller did not contact Hoxworth directly, his provision of confidential employee information to Supreme's recruiters constitutes indirect solicitation prohibited by Section V(F) of the Employment Agreement. (*See id.*) And, Miller's use of Edwards to solicit Wagner to Supreme also constitutes indirect solicitation in violation of his Employment Agreement. (*See id.*)

Because Miller has violated and continues to violate the non-solicitation provision of his Employment Agreement, Churchill had to file this action against Miller and file this Motion to

---

[1] Miller Employment Agreement (Sept. 13, 2024), attached hereto as Exhibit 4.

enforce the non-solicitation provision. With this litigation against Miller to enforce the terms of the Employment Agreement and to enjoin his continuous violations of the Employment Agreement, the non-solicitation period must be tolled either as required pursuant to the Employment Agreement or because equity requires it. (*See* Ex. 4, at § V(F).) As such, as a consequence of Miller's contempt, the non-solicitation period set forth in the Injunction Order should be extended until February 17, 2027 – the date of Miller's most recent solicitation.

## CONCLUSION

The facts are plain. The law is clear. The remedy is justified. Miller agreed not to solicit Churchill employees directly or indirectly. He did both. He recruited Edwards to do what he could not. He deployed a proxy to execute his scheme. He violated this Court's order not through accident or misunderstanding, but through calculation and design. If it looks like contempt, walks like contempt, and quacks like contempt–this Court should find it so.

Churchill respectfully requests that the Court enter an Order that:

1.      Defendant be found in civil contempt for violating the Agreed Preliminary Injunction (Doc. No. 21);

2.      Andrew Edwards be expressly bound by the Agreed Preliminary Injunction as a person acting in active concert or participation with Defendant pursuant to Fed. R. Civ. P. 65(d)(2)(C);

3.      Defendant pay Churchill's attorneys' fees and costs associated with bringing this Motion;

4.      Defendant pay Churchill's attorneys' fees and costs incurred in connection with the discovery that led to identifying the violations of the Agreed Preliminary Injunction;

5. Defendant, his agents, and anyone acting in concert with Defendant are prohibited from contacting any Churchill employee for the purpose of soliciting them to leave Churchill or join a competitor;

6. Defendant must, within one week of this Order, provide to Plaintiff all unprivileged text message and email communications between himself and Andrew Edwards from June 1, 2025 to the present;

7. Defendant must, within one week of this Order, produce to Plaintiff all communications, whether direct or through any intermediary, with any current or former Churchill employee from July 21, 2025 to the present;

8. Defendant must, within one week of this Order, submit a sworn affidavit identifying: (a) all persons he has directed, encouraged, or requested to contact Churchill employees since July 21, 2025; (b) all Churchill employees who have been contacted at his direction; and (c) a certification of his compliance with the Agreed Preliminary Injunction going forward;

9. The non-solicitation period set forth in the Agreed Preliminary Injunction be extended for an additional twelve months until February 17, 2027, as a consequence of Defendant's contempt; and

10. Granting Churchill any other such further relief as the Court may deem just, equitable, and proper.

Dated: March 6, 2026

*/s/ Lucas A. Markowitz*
Lucas A. Markowitz, Esq. (admitted *pro hac vice*)
Sean Hennessy, Esq. (admitted *pro hac vice*)
Arielle Stephenson (admitted *pro hac vice*)
**MITCHELL SANDLER PLLC**
2020 K Street NW, Suite 760

Washington, DC 20006
Office: (202) 886-5260
lmarkowitz@mitchellsandler.com
shennessy@mitchellsandler.com
astephenson@mitchellsandler.com

Stephen H. Price, TN Bar No. 014658
**JACKSON LEWIS, P.C.**
611 Commerce Street, Suite 2803
Nashville, TN 37203
Office: (615) 565-1661
stephen.price@jacksonlewis.com
***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2026, the foregoing *Plaintiff Churchill Mortgage Corporation's Memorandum in Support of its Motion for Contempt* was filed with the Clerk of the Court for the United States District Court for the Middle District of Tennessee using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Lucas A. Markowitz*
Lucas A. Markowitz, Esq.
