IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| CHURCHILL MORTGAGE CORPORATION<br><br>        Plaintiff,<br><br>  v.<br><br>JEFFREY MILLER,<br><br>        Defendant. | Civil Action No. 3:25-cv-00765<br><br>Judge Aleta A. Trauger |

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO STRIKE AND FOR SANCTIONS

Plaintiff, Churchill Mortgage Corporation ("Plaintiff" or "Churchill") submits this opposition to Defendant, Jeffrey Miller's ("Defendant" or "Miller") Motion to Strike and for Sanctions (Dkts. 58-59) ("Motion").

### INTRODUCTION

Churchill's February 19, 2026 Letter (Dkt. 57) was not improper. It was not sanctionable. It was what this Court asked for: a status update on mediation. Churchill notified the Court that it could not proceed in good faith while Defendant—already subject to a preliminary injunction he willingly agreed to—continued to engage in the very conduct this Court had enjoined. That is not vexation. It's candor.

Defendant's Motion fails at every turn. There is no procedural mechanism to strike a status letter. There is no legal basis to compel voluntary mediation; the concept is self-refuting. And there is no factual or legal support for sanctions under 28 U.S.C. § 1927. What the record does reveal is a pattern of egregious misconduct and gamesmanship by Defendant: violations of this Court's

1

Preliminary Injunction, playing games during discovery, coaching subordinates on how to steal Churchill's confidential information, and negotiating in bad faith while orchestrating the defection of an entire branch. These repeated transgressions are precisely why Churchill could not proceed with mediation—not obstinance, but the impossibility of trusting an adversary who has demonstrated at every turn that he will not honor his commitments. If the Court is looking for a good example of "unreasonably and vexatiously multiplying the proceedings," look no further than Defendant's conduct generally and this Motion in particular. It should be denied in its entirety.

## FACTUAL BACKGROUND

### A. The Complaint, TRO and Preliminary Injunction.

Churchill filed this action on July 9, 2025, alleging that Miller breached his employment agreements by soliciting Churchill employees to join Everett Financial, Inc. dba Supreme Lending ("Supreme"), misappropriating Churchill's confidential information and trade secrets, and making defamatory statements about Churchill's financial condition. (Dkt. 1.) Two days later, this Court granted Churchill's application for a Temporary Restraining Order (Dkts. 9-12), enjoining Miller from soliciting employees and from using or disclosing confidential information. (Dkt. 16.) On July 21, 2025, the parties entered into an Agreed Preliminary Injunction (the "Injunction Order"), which this Court entered the same day. (Dkt. 21.)

The Injunction Order's prohibitions are explicit and unambiguous. Paragraph 6 provides that "[u]ntil May 21, 2026, Miller will not directly or *indirectly* solicit any current employee of Churchill to leave their employment with Churchill or to accept employment with another entity, including Supreme." (Dkt. 21 at 3-4, ¶ 6) (emphasis added.) The phrase "directly or indirectly" is not surplusage—it was included to prevent Miller from accomplishing through intermediaries what

he could not do himself. As demonstrated below, Miller has repeatedly and flagrantly violated both the letter and spirit of this Court's Order.

**B. Initial Litigation and Failed Resolution Efforts Reveal a Pattern of Bad Faith Conduct**

  *1. Churchill Attempts to Negotiate a Settlement While Miller Secretly Orchestrates a Branch Defection.*

In October and November 2025, the parties engaged in earnest settlement discussions. They had agreed on a figure; they were finalizing non-monetary terms; Churchill's signature on a full release—including a release of Supreme—was imminent. But while Churchill negotiated in good faith, Miller and Supreme were simultaneously orchestrating the defection of an entire Churchill branch. (October Emails, attached as Ex. 1); (November Emails, attached as Ex. 2.) On November 6, 2025, Defendant's attorney pressed Churchill with curious urgency. (Ex. 2 at 1-2, 6.) Later that same day, Julie Lapham, Branch Manager of Churchill's Missoula, Montana office, resigned along with four employees[1]—all within hours of each other. (Dkt. 61-1, ¶¶ 3, 184; *see* Ex. 12, Markowitz Decl., at ¶¶ 8-11 and Exs. B-E) (NMLS and Supreme Instagram Posts showing former Branch Manager at Churchill and as of November 2025, Branch Manager at Supreme.)) Shortly thereafter, the entire Missoula Branch joined Supreme. (*See id.* at ¶¶ 8-11 and Exs. B-E.) The timing reveals what was actually happening: Defendant was rushing a general release through the door while knowing his employer was about to poach an entire office.

Churchill's subsequent investigation revealed Miller's fingerprints all over this defection. A Missoula marketing billboard company confirmed that Azemira Tucakovic—Miller's former assistant at Churchill, whom he brought to Supreme—contacted them in October 2025 to inquire

---

[1] The four other Churchill employees from the Missoula branch were Caitlin Peel, Janelle Chase, Jennifer Fauque, and Cherie Henslee. Their NMLS history and Supreme Instagram Posts show they previously worked at Churchill and joined Supreme as a team in November 2025. (*See* Ex. 12, Markowitz Decl., at ¶¶ 8-11 and Exs. B-E.)

3

about Supreme engaging their services. (Dkt. 61-1 at ¶127.) The inference is inescapable: Supreme, through Miller and his assistant, was planning to hire the Missoula Branch as early as October 2025—while simultaneously negotiating a settlement with Churchill and while subject to this Court's Injunction Order. Miller was negotiating in bad faith while actively violating the injunction. This duplicity is precisely what informed Churchill's reluctance to mediate.

    2. *Miller Engages in Discovery Gamesmanship.*

Miller's bad faith extended to discovery. On September 29, 2025, Defendant served discovery on Plaintiff via email to counsel of record. (September Email, attached as Ex. 3); (Interrogatories, attached as Ex. 4 at 9) (proof of service indicating service by "e-mail"); (Requests for Production of Documents, attached as Ex. 5 at 15) (same.) Churchill did the same on December 12 and 16, 2025. (December Email, attached as Ex. 6.)

On January 16, 2026—after Churchill sent a deficiency letter noting Defendant had not responded—Miller took the position, for the first time, that email service of discovery was improper. (January Email, attached as Ex. 7.) The objection was disingenuous: Miller himself had served discovery on Churchill via email months earlier, and Churchill had responded in kind without objection. Miller cannot establish the rules of engagement and then invoke those same rules as a shield when convenient. This gamesmanship is emblematic of his approach to this litigation.

    3. *Joint Mediation Report*

Given Miller's secret branch-poaching during settlement negotiations and his discovery gamesmanship, Churchill had legitimate concerns about whether its adversary was litigating in good faith. Accordingly, on January 30, 2026, the parties filed their Joint Mediation Report, in which Churchill indicated it was "not interested in a mediation at this time" but remained "open

to a negotiated resolution." (Dkt. 52.) Churchill's reluctance was not obstinance—it was a reasonable response to a demonstrated pattern of misconduct.

> 4. *Following Submission of the Joint Mediation Report, Churchill Discovers Additional Misconduct but Remains Open to Resolution.*

> > i. <u>Churchill Discovers That the Missoula Branch Defection Was Orchestrated by Miller Using Stolen Churchill Data.</u>

On February 10, 2026, Churchill discovered evidence that Julie Lapham—the Missoula Branch Manager who resigned and joined Supreme—was directly soliciting Churchill's customers using stolen data and confidential borrower documents. Lapham might have been acting in isolation. But the communications revealed something far worse: Miller himself had coached her on how to misappropriate Churchill's confidential information while evading detection. Specifically, Miller instructed Lapham not to "plug any external drive into your computer," "run any reports in encompass,[2]" or "download any documents from e folder of hard drive or email anything to your personal email." (Ex. 12, Markowitz Decl., at ¶ 4 and Ex. A, VOL0000398-99.)

Miller did not stop at telling Lapham what to avoid. He provided detailed instructions on how to steal Churchill's information undetected: she should "take pictures then you can use ChatGPT to convert the photo info into excel docs." (*Id.*) He emphasized that "[t]hose photos are important for contacts can also use ChatGPT to make them into contacts for your phone ... name email address etc etc." (*Id.* at VOL000399.) Miller was not merely aware of the misappropriation; he was actively directing it.

Lapham followed Miller's instructions precisely. Using confidential information and consumer non-public information, she reached out to at least four Churchill borrowers and sent

---

[2] Encompass is Churchill's password protected loan origination software which houses detailed records of every customer, loan, and highly sensitive non-public information.

solicitation materials bearing Supreme branding. (Dkt. 61-1, Email attaching Cease-and-Desist Letter, attached as Ex. 10.) This is not speculation. Lapham attached to her solicitation a borrower's closing disclosure dated November 5, 2025—one day before she resigned. (Lapham Solicitation, attached as Ex. 8.[3]) The document itself lists "Churchill Mortgage Corporation" under the transaction information header for "Lender." (Ex. 8 at 2, 6.) It conclusively establishes that Lapham took this closing disclosure—containing sensitive information like the borrower's loan amount, interest rate, and address—from Churchill while still employed there. (*Id.*) Exactly as Miller had instructed.

      ii. <u>Churchill Sends Cease-And-Desist Communications Which Are Met with Urgings to Mediate.</u>

Just a day after Churchill received the complaint from a consumer regarding Lapham's use of their closing disclosure, and while that investigation was getting off the ground, on February 11, 2026, Churchill's counsel received an email from Supreme's counsel urging mediation and offering to pay the full cost if Churchill would change its position. (Email attached as Ex. 9 at 1; *see also* Dkt. 59 at 7) ("Supreme and Defendant have agreed to pay the full mediation fee.") Shortly thereafter, Churchill sent Supreme a Cease-and-Desist Letter regarding Lapham's conduct and her connection to Miller, requiring an initial response by February 18, 2026. (Ex. 10.) Despite the serious violations—and given the rapport between counsel and the clear proof of misconduct attached to the letter—Churchill agreed to mediation on February 12, 2026. This decision demonstrated Churchill's continued willingness to resolve the matter notwithstanding mounting evidence of violations. On February 13, 2026, the parties filed a Joint Status Report, and this Court held a telephonic status conference. (Dkts. 54-55.) The Court stayed all deadlines pending mediation. (Dkt. 56.)

---

[3] The document is redacted to avoid display of all sensitive and confidential information.

On February 17, 2026, Supreme denied the C&D Letter's allegations. (Supreme Response Letter, attached as Ex. 11.) Churchill was understandably dissatisfied, but not intractable. The record is clear: Miller coached Lapham on how to steal confidential data. Lapham stole it: consumer non-public information, closing disclosures, the intimate financial details of Churchill's borrowers. (Ex. 8 at 2, 6.) And so, on February 19, 2026, counsel for Supreme and Churchill spoke by phone. (Dkt. 59-2.) The question was not whether to mediate. The question was what information Supreme could provide to assure Churchill that Lapham possessed no additional misappropriated data—that the bleeding had stopped—so that mediation could proceed. (*See id.*) Supreme appeared willing to earnestly discuss these issues. (*Id.*) Churchill remained open to resolution. It was working toward a path forward, not away from one.

      iii. <u>Churchill Discovers Miller's Continued Violations Through Indirect Solicitation.</u>

As Churchill was working out what information Lapham and Supreme could provide about her misappropriation, Churchill learned that Miller was indirectly soliciting Churchill employees in direct violation of the Injunction Order. His method was calculated: rather than solicit employees directly, he recruited Andrew Edwards—his former marketing manager and direct report—to do the soliciting for him. (*See* Sheree Bartlett Declaration, Dkt. 63-3 at ¶¶ 6-7.) Miller and Edwards share a professional relationship spanning over a decade. Both worked at Rivermark Community Credit Union from approximately 2012 to 2014, then at Directors Mortgage from 2014 to 2019, where Miller supervised Edwards. (*Id.* at ¶¶ 4-5.) When Miller joined Churchill in 2019, he brought Edwards with him as Director of Marketing for Miller's region. (*Id.* at ¶¶ 6-7.) Edwards was terminated by Churchill in August 2023 due to market conditions. (*Id.* at ¶¶ 8.) Following Miller's termination on May 21, 2025, Miller recruited Edwards to join Supreme, where Edwards

7

was hired in September 2025—just two months after the Injunction Order was entered. (*Id.* at ¶¶ 10-11.)

Supreme was technically free to hire Edwards without violating the Injunction Order. But Edwards is not free to solicit Churchill employees using information from Miller, at Miller's direction, for Miller's benefit. That is precisely the "indirect" solicitation the Injunction Order prohibits. The evidence demonstrates this is exactly what occurred. Edwards attempted to recruit Andrew Wagner, a top producer at Churchill. (*Id.* at ¶¶ 12.) He sent a text message stating he had "teamed up with Supreme Lending" and asked whether Wagner would be "open to a conversation to explore what the benefits could be [at Supreme]." (*Id.* at ¶¶ 12-13; Benjamin Delery Declaration, Dkt. 63-4 at ¶¶ 4-5.)

Edwards did not reach out to Churchill employees prior to him being recruited to join Supreme by Miller. But now that Miller cannot directly solicit Churchill employees, Edwards is conveniently soliciting Churchill employees. The inescapable conclusion: Miller is arranging, directing, and benefiting from these solicitations, using Edwards as his agent to evade the letter of the Injunction Order while violating its spirit and purpose.

### iv. Churchill Notifies the Parties and The Court That It Cannot Mediate.

Upon discovering this violation, Churchill's counsel emailed Supreme's counsel and copied Miller's counsel to update everyone on the status of mediation. (Dkt. 59-2.) Shortly thereafter, Churchill promptly notified the Court that it could not proceed with mediation in good faith while Defendant continued to engage in conduct this Court had enjoined. (Dkt. 57.) Churchill stated in its letter that it "remains willing to resolve this matter, but not while violations continue unabated" and would "work with Defendant's counsel to come up with a new scheduling order and will remain open to mediation in the future." (*Id.*)

8

Case 3:25-cv-00765   Document 64   Filed 03/06/26   Page 8 of 14 PageID #: 683

Churchill's decision to disengage from voluntary mediation cannot support sanctions. Churchill took every step to avoid expanding the proceedings. It made decisions within hours of learning concerning information, postponed the mediation with ample time to adjust travel plans, and promptly notified all parties. Far from multiplying proceedings, Churchill streamlined them. From early attempts at settlement to attempts to informally resolve issues between counsel, Churchill has been shooting straight throughout. It is Miller, Miller's new employer, Supreme, and Miller's counsel who have been the obstacles to resolution at every turn.

## ARGUMENT

**A. There Is No Legal Basis to Strike Churchill's Letter.**

Miller's Motion fails as a matter of law. While granting or denying a motion to strike lies within the trial court's sound discretion, *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 480 (6th Cir. 2003), the Federal Rules of Civil Procedure do not contemplate motions to strike documents other than pleadings. *Fox v. Mich. State Police Dep't*, 173 F. App'x 372, 375 (6th Cir. 2006); Fed. R. Civ. P. 12(f) (providing that "[a] court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.".) Churchill's letter is not a pleading—it is a status update. Miller cites no authority permitting a motion to strike such correspondence. That is because none exists.

Letters are proper and accepted methods to update the Court on case status. *See Felts v. Cleveland Hous. Auth.*, 821 F. Supp. 2d 968, 970 (E.D. Tenn. 2011) (notifying court of mediation through letter from attorney.) This Court's own Practice and Procedure Manual acknowledges that correspondence with the Court, while discouraged, may be appropriate in certain circumstances. *Practice and Procedure Manual for Judges and Magistrate Judges for the Middle District of Tennessee (Judge Aleta A. Trauger)* § II.B. The Manual requires such correspondence be served

9

on opposing counsel and filed with the Clerk as a public record. Churchill complied fully. Miller's Motion is procedurally improper and should be denied.

### B. The Court Should Decline to Compel Futile Mediation.

Miller's request that this Court compel mediation is legally unfounded and practically futile. The mediation at issue was voluntary-based solely on the parties' consent. There was no Court-ordered mediation. A court cannot compel parties to engage in a voluntary process; the concept refutes itself. *See Developers Sur. & Indem. Co. v. Indep. Living Ctr. Bldg. Co.*, No. CA 16-0430-WS-MU, 2017 U.S. Dist. LEXIS 233954, at *7-8 (S.D. Ala. Mar. 28, 2017) (noting the Court cannot compel voluntary mediation).

The voluntary nature of mediation is what makes it effective. Mediation requires good faith from both parties. Churchill cannot—and should not—be forced to mediate with a party that has demonstrated a pattern of bad faith: secret branch-poaching during settlement negotiations, discovery gamesmanship, and continued violations of this Court's Injunction Order. Any mediation under these circumstances would be an exercise in futility. Miller's preference for a pointless proceeding over a candid acknowledgment of the facts does not obligate Churchill or this Court to indulge him.

### C. Churchill's Decision to Decline Voluntary Mediation Provides No Basis for Sanctions.

Miller's demand for sanctions under 28 U.S.C. § 1927 is meritless. Section 1927 provides that an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. The Sixth Circuit has recognized that sanctions under this provision require clearing a "high bar" and are "reserved only for instances of objectively unreasonable conduct." *Shepard & Assocs., Inc. v. Lokring Tech., LLC*, No. 1:20-cv-02488, 2024 WL 1347355, at *9 (N.D. Ohio Mar. 29, 2024) (citing *Red Carpet*

*Studios Div. of Source Adv. Ltd. v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006)). Churchill's counsel's conduct comes nowhere near this standard. Miller cannot satisfy any element of Section 1927.

### 1. Churchill's Counsel Did Not Unreasonably or Vexatiously Multiply These Proceedings.

To establish a violation of Section 1927, Miller must demonstrate that counsel's conduct "results in proceedings that would not have been conducted otherwise." *Peterson v. BMI Refractories*, 124 F.3d 1386, 1396 (11th Cir. 1997); *see also Celsius Holdings, Inc. v. A SHOC Bev., LLC*, No. 22-12687, 2025 WL 2887300, at *6 (11th Cir. Oct. 10, 2025) (conduct must "extend or delay the judicial process beyond the normal course of proceedings".) Critically, "even 'unreasonable and vexatious' conduct—is not sanctionable unless it results in proceedings that would not have been conducted otherwise." *Peterson*, 124 F.3d at 1396. Miller cannot make this showing.

Churchill's decision to cancel a voluntary mediation did not multiply proceedings. *Horton v. Calvary Portfolio Services, LLC*, No. 13cv0307 JAH(WVG), 2014 U.S. Dist. LEXIS 194559, at *7-8 (S.D. Cal. Aug. 12, 2014) (declining Section 1927 sanctions because the mediation was voluntary and there was "no explicit order, either stipulated to by the parties or issued by this Court, requiring the parties' attendance at the mediation".) The same analysis applies here. Churchill's decision did not expand the proceedings; it reduced them. Churchill promptly notified the parties and the Court that it could not proceed in good faith given Miller's continued injunction violations. This saved the parties and the mediator from a futile exercise. Far from multiplying proceedings, Churchill's conduct streamlined them.

Miller's decision to file this motion is his own choice. It is not a natural consequence of cancelling a mediation based on newly discovered information—and courts decline to impose sanctions for such motions. *See Golikov v. Walmart Inc.*, No. 2:24-cv-08211-RGK-MAR, 2025

WL 3760635, at *2 (C.D. Cal. Dec. 19, 2025) (declining to award costs for a sanctions motion because that motion "was not part of" the perceived "multiplication").

Consider the alternative. Had Churchill's counsel done what Miller now suggests—attended mediation knowing it would be unproductive—the result would have been the same expenditure of counsel time Miller complains about, plus the waste of mediator and party resources. Courts recognize that failure to notify is what triggers sanctions, not the decision to cancel. *See Harrington v. Disney Reg'l Entm't, Inc.*, 276 F. App'x 863, 868-69, 877-78 (11th Cir. 2007) (sanctions imposed for failing to notify another party that client could not attend deposition.) Churchill provided prompt notice here. *In re Thompson* is similarly instructive. 520 B.R. 713 (Bankr. E.D. Wis. 2014.) There, no sanctions were imposed even though counsel failed to "attend several scheduled mediation sessions" and caused six-hour delays when mediation was rescheduled. *Id.* at 725. The Court found the conduct did not "unreasonably and vexatiously multiply the proceedings" and denied sanctions. *Id.* at 726.

Cases where Section 1927 sanctions have been imposed bear no resemblance to this situation. In *Steinert v. Winn Group, Inc.*, the Tenth Circuit upheld sanctions where counsel sought "numerous extensions of time" based on misrepresentations and the district court identified "a pattern of inexcusable neglect" throughout the litigation. 440 F.3d 1214, 1226 (10th Cir. 2006.) There is no such pattern here. Churchill has litigated this case in good faith, responded to Miller's discovery despite his gamesmanship, and promptly notified all parties when circumstances changed.

Miller cites no case law justifying sanctions in any analogous situation—because none exists. His motion rests entirely on advocacy unsupported by authority. The assertion that his counsel shifted attention from discovery to mediation preparation is not a multiplication of

12

proceedings because the Court stayed all deadlines pending mediation. (Dkt. 56.) Nor is any "shifted attention" attributable to Churchill. Miller made his own litigation choices. He cannot now seek sanctions because those choices proved unnecessary.

    2. *Miller Has Failed to Identify Any Cognizable Costs.*

Even if Miller could establish that Churchill's counsel's conduct was sanctionable—which he cannot—his claimed costs are fatally vague and unsupported. Miller seeks "any costs associated with cancellation of mediation," yet he fails to identify what those costs are or whether any payment is actually owed. Counsel is unaware of any deposit paid to the mediator. Miller also seeks "travel expenses" but has not alleged that he incurred any such expenses or that they were non-refundable. Speculation and conclusory assertions cannot support a sanctions motion. The Motion should be denied in its entirety.

Dated: March 6, 2026

    Respectfully submitted,

    */s/ Lucas Markowitz*
    Lucas A. Markowitz, Esq. (admitted pro hac vice)
    Sean Hennessy, Esq. (admitted pro hac vice)
    Arielle Stephenson (admitted pro hac vice)
    **MITCHELL SANDLER PLLC**
    2020 K Street NW, Suite 760
    Washington, DC 20006
    Office: (202) 886-5260
    lmarkowitz@mitchellsandler.com
    shennessy@mitchellsandler.com
    astephenson@mitchellsandler.com

    Stephen H. Price, TN Bar No. 014658
    JACKSON LEWIS, P.C.
    611 Commerce Street, Suite 2803
    Nashville, TN 37203
    Office: (615) 565-1661
    stephen.price@jacksonlewis.com

    ***ATTORNEYS FOR PLAINTIFF***

13

Case 3:25-cv-00765   Document 64   Filed 03/06/26   Page 13 of 14 PageID #: 688

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2026, the foregoing Plaintiff Churchill Mortgage Corporation's Opposition to Defendant's Motion to Strike and for Sanctions was filed with the Clerk of the Court for the United States District Court for the Middle District of Tennessee using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Lucas A. Markowitz*
Lucas A. Markowitz
